**IN THE COURT OF APPEALS OF IOWA**

No. 4-022 / 13-0177
Filed April 16, 2014

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**THOMAS LEE HANSEN SR.,**
     Defendant-Appellant.
_____

     Appeal from the Iowa District Court for Washington County, Joel D. Yates,

Judge.

     Thomas Hansen Sr. appeals from his conviction of second-degree

murder. **AFFIRMED.**

     S.P. DeVolder of The DeVolder Law Firm, Norwalk, for appellant.

     Thomas J. Miller, Attorney General, Darrel Mullins and Andrew Prosser,

Assistant Attorneys General, and Larry Brock, County Attorney, for appellee.

     Heard by Danilson, C.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, J.**

Thomas Hansen Sr. appeals from his conviction of second-degree murder. He challenges the sufficiency of the evidence of malice aforethought to support the conviction. He also contends the trial court erred in instructing the jury, in excluding certain testimony, and in overruling his chain-of-custody objection to the handgun found at the scene of the shooting. He argues he was entitled to a new trial. Because there was substantial evidence of malice aforethought to sustain the conviction, the jury was properly instructed about permissible inferences, and the trial court did not abuse its discretion in ruling on evidentiary issues and the motion for new trial, we affirm.

**I. Background Facts and Proceedings.**

On May 1, 2011, Thomas Hansen shot his live-in girlfriend, Sharon Gerot, as she was mowing their rural Riverside home on a riding lawn mower. Gerot died of a single bullet wound to the head. Hansen was charged with first-degree murder.

At trial, Todd Hahn—Hansen and Gerot's neighbor—testified that he and his wife were driving home westbound on 135th Street at about 3:40 p.m. on May 1, 2011. Hahn's vehicle had just crossed over highway 218, and he was driving by Hansen's house. Out of the corner of his eye, Hahn saw a person operating a riding lawnmower on Hansen's property. Hahn saw the person's "head and hands snapped back." Hahn thought the person may have struck a fence or a wire. He "backed up real fast to their side drive, into their horse lot" and got out of his vehicle to check on the person's welfare. Hahn hopped a fence, hurried to the mower, and saw a body lying next to it face-down. He could not tell who the

person was. He looked for movement. Hahn testified that Hansen "came up to" Hahn, told him "not to touch it," and to "call the cops." While Hahn was making the call, Hansen said, "I shot 'em." Hahn could see that there was a lot of blood around the person's face. Hahn observed that Hansen "just didn't seem quite himself and was very, very—very calm." Hahn stated Hansen "seemed a little off" and "the whole situation struck [him] as strange."

At about 3:45 p.m., Iowa State Trooper Allen Konecne was on patrol and heard a radio report of a shooting just west of highway 218 and south of Riverside. Trooper Konecne arrived at the scene at 4:02 p.m. where he saw the officers first to the scene, Deputy Brandon Hamilton and Trooper Justin O'Rourke. They had Hansen on the ground and were handcuffing him. Trooper Konecne assisted in escorting Hansen to Deputy Hamilton's squad car. While Trooper Konecne was taking Hansen to the car, Hansen stated, "I just couldn't take it anymore." Trooper Konecne testified Hansen "wasn't excited. Pretty neutral, not showing much emotion." Trooper Konecne testified that after placing Hansen in the patrol car, he entered Hansen's house to make sure no one else was at the scene. He walked through the sliding glass doors on the patio deck, entered the kitchen, and saw a handgun on the kitchen counter.

Iowa Division of Criminal Investigation (DCI) Special Agent Jagat Sandhu was notified of the incident about 5:00 p.m. Agent Sandhu assists local law enforcement in the investigation of major crimes and arrived at the scene just after 6:00 p.m. He took pictures of the scene and made measurements. Agent Sandhu was assisted in his work by Iowa State Trooper Jonah Grier. Agent Sandhu concluded that the lawn tractor completed an entire circle after Gerot

was shot and before she fell off the mower. The blood circle was 23 feet in diameter, with the closest blood spot 59.1 feet from the sliding patio door and the farthest spot some 84 feet from that door. The lawn tractor stopped some sixty-nine feet from the patio door.

Agent Sandhu and Trooper Grier also entered and searched the house after a warrant was obtained. Agent Sandhu discovered a .40-caliber pistol on the kitchen counter and one spent .40-caliber shell casing on the kitchen floor. Agent Sandhu stated these items were sent to the DCI crime lab in Ankeny, along with a .22-caliber handgun he had found in a bedroom of the house. In the garage, the officers found a tote bag containing a holster and two magazines for the .40-calibur handgun. They did not locate the bullet that struck Gerot.

Agent Jeff Uhlmeyer checked Hansen's telephone messages, and there was a call back message from the 911 dispatcher.

Victor Murillo is a criminologist at the DCI labs in Ankeny. He examined a .40-caliber Smith and Wesson handgun and a spent shell casing. He fired two rounds from the gun and compared one of the spent shell casings from a round he had fired with the casing that had been sent to the lab. Murillo concluded that the markings on the back of each of the casings were a match. Murillo concluded that the spent shell casing that had been sent to the lab was ejected from the .40-caliber Smith and Wesson handgun that also had been sent to the lab.

Dr. Marcus Nashelsky is a forensic pathologist with the University of Iowa Hospitals and Clinics and performed the autopsy of Gerot's body. He testified Gerot died from a single bullet wound to her head. The size of the wound

indicated she was shot with a .40-caliber bullet. The bullet struck her on the left temple and exited out of the other side of her head just behind her right ear.

Hansen testified in his own defense. He stated he got up at 5:30 a.m. on May 1 to perform chores. He had intended to drive to Yellowstone National Park that day; Gerot was to leave three weeks later to join him there, where they were to perform seasonal work. But Gerot got out of bed around 10:00 a.m., and "[s]he was not happy." Gerot had several items she wanted completed before Hansen left for Yellowstone. Hansen testified Gerot verbally disparaged him; assaulted him;[1] and then she waved the .22-caliber handgun around while saying, "I could shoot this, I could put a bullet in my head, I could put a bullet in your head." Hansen testified Gerot continued to belittle him and choked him. She threw ice at him and spit on him. Eventually, Gerot left the house to mow the yard.

Hansen testified he followed Gerot into the garage to tell her to be careful of the live electric fence as she mowed, but she shoved him to the ground. He wanted to "[g]et her the hell out of here." Hansen testified that he then "did one of the most stupid things in the world. The weapon was right there. I grabbed it. And I remember thinking that 'I'm going to scare her and she'll leave.'" He testified further,

> Well, I went behind the cars and went up to the door, and she went down to mow, and I walked over to the sliding glass doors, which were open, and I made the biggest mistake of my life. I never wanted to hit her. I couldn't—I never wanted to hit her; I

---

[1] According to Hansen, Gerot had assaulted him many times before. Gerot weighed about 200 pounds; Hansen weighed about 140 pounds. Hansen was seventy-one at the time of the incident; Gerot was fifty-six.

wanted to scare her, scare her and get her the hell out of there. Sorry.

Q. And what did you do next? A. Well, I—I just went "Bang." And I saw dust in the back of the horse lot come up. And then I saw her flop backwards on the mower. When I first saw the dust, I thought "I scared her," and my God, she—she went backwards. She went backwards on the mower, and apparently her foot caught the clutch, and it kept going. I turned around and I went in and I grabbed the phone and dialed 911. I couldn't get through. I hung up and I called [son] Tom, and I told Tom, "I need help, I need help." I don't know what I really said. I just, you know—And when I was talking, I heard the mower stop.

I hung up, and I started walking to the back—back door; I was walking fast to the back door. And I looked over and I saw the mower there and her beside it, and Todd Hahn coming down. He was walking up and I was walking towards him. I think he asked me what happened. And I told him I shot her. I told him to call 911, and we—I stood there and he called 911, and I went over and looked, and she was dead. I—I told Todd Hahn the address and—and then I walked back. I don't—I don't know what happened. I wasn't there. My mind—I don't know what I was thinking. But for some reason I was—"I've got to get this stuff done."

I knew there was going to be the ambulance, fire, law. I had the dogs out, I had the horses out. I had to get it ready for them. So I went back to the house, got the dogs and stuff settled in, put them in the bedroom so they wouldn't get in trouble. The cats were there. I had to go into the garage to get the dogs in. I remember whistling. The two controls for the back door are right there by that garage door. Out of habit I might have closed them. I then—It's kind of a fog. I went back out, I went back and made sure that horse gate was locked. I walked over by the mower. And I shut that off, I guess. The stupid things you think about. And then I—came back into the backyard and then I just waited. I knew—I knew everything was gone. Everything—Any hope I ever had or anything I ever had was gone.

On cross-examination, Hansen acknowledged that he told police "that [he] was seeing red, that [his] blood was boiling."

The jury found Hansen guilty of the lesser-included offense of second-degree murder.

On appeal, Hansen contends there was insufficient evidence of malice aforethought to sustain the conviction. He also urges error in the jury

instructions, the trial court's evidentiary rulings, and the denial of his motion for a new trial.

**II. Scope and Standards of Review.**

We review challenges to the sufficiency of the evidence for correction of errors at law, and we will uphold the jury's verdict if it is supported by substantial evidence. *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). Evidence is considered substantial if a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* "However, in making such determinations, we also view the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* (internal quotation marks and citation omitted).

We review challenges to jury instructions for the correction of errors at law. *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010). "Our review is to determine whether the challenged instruction accurately states the law and is supported by substantial evidence. Error in a particular instruction does not require reversal unless the error was prejudicial to the complaining party." *Id.* (citations omitted).

Our review of the trial court's evidentiary rulings is for an abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). A district court abuses its discretion when its decision rests on grounds or on reasons clearly untenable or to an extent clearly unreasonable. *State v. Richards*, 809 N.W.2d 80, 89 (Iowa 2012). There will be no abuse of discretion found unless a party has suffered prejudice. *Id.*

A district court's ruling on a motion for new trial is also reviewed for an abuse of discretion. *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006). The district court should grant the motion only if the jury's verdict is contrary to the weight of the evidence. *Id.* at 134–35.

### III. Analysis.

***A. Sufficiency of the evidence.*** Hansen first contends there is insufficient evidence of malice aforethought to sustain the second-degree murder conviction. He emphasizes that in his statement to police after the shooting and his testimony he claimed he only meant to scare Gerot. Malice aforethought is an essential element of second-degree murder and separates second-degree murder from other lesser-included offenses of first-degree murder. *State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003).

"Malice aforethought is a fixed purpose or design to do physical harm to another that exists before the act is committed." *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002); *accord Serrato*, 787 N.W.2d at 469. It does not need to exist for any particular length of time, "'but only requires such deliberation as *makes a person appreciate and understand at the time the act is committed its nature and probable consequences* as distinguished from an act done in the heat of passion.'" *Serrato*, 787 N.W.2d at 469 (quoting *State v. Gramenz*, 126 N.W.2d 285, 290 (Iowa 1964)).

"Because this element is a state of mind, circumstantial evidence is generally used to prove malice." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003); *see also Serrato*, 787 N.W.2d at 469 ("Because it is a state of mind, malice aforethought often evades direct evidence."). The relationship between

the state of mind, malice aforethought, and the homicidal act "is more accurately characterized as a causal relationship than as a temporal relationship." *State v. Bentley*, 757 N.W.2d 257, 265 (Iowa 2008). "In other words, the malice must result in the homicidal act." *Id.* Our supreme court has stated, "Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought. Malice may also be inferred from the use of a deadly weapon." *Buenaventura*, 660 N.W.2d at 49 (citing *State v. Reeves,* 636 N.W.2d 22, 25–26 (Iowa 2001)). This permissive inference of malice aforethought may be rebutted by evidence showing the killing was "accidental, under provocation, or because of mental incapacity." *State v. Reeves*, 670 N.W.2d 119, 207 (Iowa 2003).

Hansen points to evidence, primarily his own testimony, which he contends establishes he did not act with malice aforethought but "in the heat of passion and without an understanding of the nature of his acts or their possible consequences." It was for the jury to determine whether Hansen's testimony was credible. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984) (stating that "evidence, if deemed credible by the jury, would substantiate defendants' alibi and serve to acquit defendants," but noting "the jury is at liberty to believe or disbelieve the testimony of witnesses as it chooses"). "The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). To reach their verdict, it is the function of the jury to sort out the evidence presented and place credibility where it belongs. *Blair*, 347 N.W.2d at 420; *see also State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) ("It is not the

province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.").

Hansen acknowledged he was angry on May 1 and that he told police his "blood was boiling." He stated he "just couldn't take it anymore." *See Buenaventura*, 660 N.W.2d at 49 ("Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought."). Rather than leave when Gerot began to mow the yard, Hansen retrieved a handgun from its holster in a tote in the garage. He walked through the garage and into the house. He passed through the kitchen to the patio doors and fired, shooting Gerot in the head. These circumstances provided ample evidence from which a jury could find that the defendant acted with a fixed purpose or design to do physical harm to Gerot. *See id.* at 50; *see also State v. Wedebrand*, 602 N.W.2d 186, 189 (Iowa Ct. App. 1999) ("Proof of the requisite intent or malice aforethought may be accomplished by inferences made from the acts and conduct of the defendant and the means used in doing the wrongful and injurious acts."). There is substantial evidence from which a jury could conclude Hansen acted with malice aforethought.

**B. Jury instructions.** Hansen contends he was denied due process because the jury instructions allowed the jury to infer malice simply because he used a gun, which relieved the State from its burden to prove his guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

The State contends Hansen's argument on appeal is different than presented to the trial court, and therefore, the issue is not properly before us. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 2000) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court."). At trial, Hansen's argument with respect to an impermissible inference was addressed to the charge of first-degree murder.[2] Even if we presume the objection also addressed the charge of second-degree murder, arguments similar to Hansen's have been rejected by our supreme court in *Henderson v. Scurr*, 313 N.W.2d 522, 526 (Iowa 1981), and *State v. Elam*, 328 N.W.2d 314, 318 (Iowa 1982). In *Elam*, 328 N.W.2d at 318, the defendant argued his due process rights were violated by a jury instruction, which read,

> You are instructed that a shotgun is a dangerous weapon.
> You are further instructed that when a person intentionally uses a dangerous weapon against another and death results, you may, but are not required to infer that the killing was with malice aforethought.
> You are also instructed that if a person, with opportunity to deliberate, intentionally uses a dangerous weapon against another

---

[2] Defense counsel stated:

> I object to Instruction Number 21 and Number 22, essentially on the same basis that those instructions violate due process of law under the 14th Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution, in that the court basically relieves the State from proving beyond a reasonable doubt numerous elements of the *charge of first-degree murder, including those of malice*, premeditation, and specific intent to kill. And I believe those two instructions constitute improper judicial comment on the evidence in terms of focusing the jury on very specific bits of evidence in this case and telling them what their inference can be as to whether the State has proved the elements.

(Emphasis added.)

and death results, you may, but are not required to, infer, in the absence of evidence to the contrary, that such weapon was used with malice, deliberation, premeditation and a specific intent to kill.

The *Elam* court wrote,

>   The defendant asserts that this instruction violates his constitutional right to due process by shifting the burden of proof as it "creates the possibility that a reasonable juror could believe that the instruction relieved the State of the burden of proving [he] acted with malice." The defendant acknowledges that a similar instruction before this court has withstood a constitutional due process challenge in *Henderson v. Scurr*, 313 N.W.2d 522, 526 (Iowa 1981), but he submits that the instruction in the present case "differs significantly" from the one given in *Henderson*, arguing it does not contain an additional paragraph found in *Henderson* which told the jury that the inference of malice from the use of a dangerous weapon is not conclusive, and may be considered with all the evidence in the case. *Id.* at 524.
>
>   The proper inquiry, as pointed out by the State, is whether the instruction fully apprised the jury of their option to reject the inference of malice, i.e., whether it clearly conveyed to the jury that the inference was permissive. *See Ulster* [*Cnty. Ct. v. Allen*, 442 U.S. 140, 156-57] (1979) (distinguishing a permissive inference from a mandatory presumption and discussing its effect on burden of proof). It would appear the instruction properly conveyed this option, and thus did not unconstitutionally shift the burden of proof. This position is supported by the fact that the term "infer" rather than "presume" was used, *see State v. Rinehart*, 283 N.W.2d 319, 321-23 (Iowa 1979), *cert. denied*, 444 U.S. 1088, 100 S. Ct. 1049, 62 L. Ed. 2d 775 (1980) ("right to infer" language "fully apprised" the jury of their option to reject the inference), and by the trial court's characterization of the inference, stating: "you may, but you are not required to infer," (such language would appear equivalent to the last paragraph in *Henderson*, 313 N.W.2d at 524).
>
>   In addition, defendant argues that the burden of proof as to deliberation, premeditation, and specific intent to kill was impermissibly shifted by use of the language "in absence of evidence to contrary." This court has previously held that such language, while surplusage, does not unconstitutionally shift the burden of proof to the defendant. *See State v. Jeffries*, 313 N.W.2d 508, 509-10 (Iowa 1981). We continue to adhere to this view.

328 N.W.2d at 318.

Here, Instructions Nos. 2 and 3 clearly informed the jury that the State was required to prove the defendant guilty beyond a reasonable doubt. Instruction No. 17 informed the jury:

> The State must prove all of the following elements of Murder in the First Degree:
> 1. On or about May 1, 2011, in Washington County, Iowa, the defendant shot Sharon Gerot.
> 2. Sharon Gerot died as a result of being shot.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly, and with the specific intent to kill Sharon Gerot.
> If the State has proved all the elements, the defendant is guilty of Murder in the First Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in the First Degree and you will then consider the charge of Murder in the Second Degree, explained in Instruction No. 26.

The jury was informed of the permissive inference that may arise from a person's use of a dangerous weapon:

> INSTRUCTION NO. 21
> If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation, and the specific intent to kill.

Additionally, the jury was instructed:

> INSTRUCTION NO. 22
> Malice aforethought may be inferred from the defendant's use of a dangerous weapon.

> INSTRUCTION NO. 23
> You are instructed that a handgun, by law, is a dangerous weapon.

And the elements of murder in the second degree were stated as follows:

> 1. On or about May 1, 2011, the defendant shot Sharon Gerot.
> 2. Sharon Gerot died as a result of being shot.
> 3. The defendant acted with malice aforethought.

If the State has proved all the elements, the defendant is guilty of Murder in the Second Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in the Second Degree and you will then consider the charge of Voluntary Manslaughter, explained in Instruction No. 29.

We conclude the instructions correctly state the law and are supported by substantial evidence. *See id.* Instructions No. 21 and 22 were not specifically referenced in either the first-degree or second-degree murder instruction. The jury was instructed that they were required to consider all the instructions together as no one instruction includes all the applicable law.[3] When read together, the jury instructions fully apprised the jury of their option to reject the inference of malice. *See id.*; *see also Allen*, 442 U.S. at 156 ("[T]he ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt."). We conclude the jury instructions did not deprive Hansen of his right to due process.

### C. Evidentiary rulings.

Hansen did testify at trial. We have set out some of his testimony earlier in this opinion. On appeal, however, he contends the trial court erred in ruling his pretrial statement was inadmissible hearsay. He points to no specific statement made during the interview that he believes should have been admitted. Rather, Hansen sought to admit, via testimony by DCI investigator Jeff Uhlmeyer, a

---

[3] In evaluating jury instructions, "we must read all of the instructions together, not piecemeal or in artificial isolation." *State v. Bennett*, 503 N.W.2d 42, 45 (Iowa Ct. App. 1993).

transcript of his interview with the Uhlmeyer and another investigator, Chad Ellis, conducted at the DCI on May 1. In his offer of proof, Hansen submitted the thirty-six-page transcript of his recorded interview with the investigators. The interview began at 7:30 p.m. and ended about 8:45 p.m. Defense counsel argued the transcript should be admitted as an excited utterance or under the residual exception to the hearsay rule so the defendant would not have to testify. The district court ruled the recorded interview was inadmissible hearsay. On appeal, Hansen challenges that ruling.

"'Hearsay' is a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801. Hansen's out-of-court statements (and the law enforcement officers' questions that evoked them) were being offered to substitute for Hansen's trial testimony and to prove the truth of the matters asserted, without the inconvenience of cross-examination: they were hearsay.[4] Defense counsel's arguments to the court acknowledge as much.

Rule 5.803 provides certain statements are not excluded by the hearsay rule "even though the declarant is available as a witness," including, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Iowa R. Evid. 5.803(2).

---

[4] Hansen's pretrial statements to do not qualify as "not hearsay" under rule 5.801(d)(2) (admission of party-opponent) because "such statements are admissible only when offered *against* the party who made the statements." *State v. Veal*, 564 N.W.2d 797, 808 (Iowa 1997), *overruled in part on other grounds by State v. Hallum,* 585 N.W.2d 249, 253-54 (Iowa 1998); *see also State v. Hines*, 790 N.W.2d 545, 553 (Iowa 2010) (citing *Veal*).

> The application of the ["excited utterance"] exclusion lies largely within the discretion of the trial court, which should consider (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999). Relying upon *Veal*, 564 N.W.2d at 808, the district court ruled the defendant's statements did not fall under the excited utterance exception. The court also ruled the residual exception, rule 5.807, did not apply. We agree.

"Obviously, an excited utterance must be made under the influence of the excitement of the incident rather than upon reflection or deliberation." *Id.* Here, Hansen's statement was made several hours after he shot Gerot. The interview lasted about an hour and fifteen minutes. Hansen offered the transcript of his interview, which includes almost forty pages of questions and answers. The statements were not spontaneous but made after he received *Miranda* warnings and in response to the investigators' questions. *See Veal*, 564 N.W.2d at 808 ("Veal's statements were not spontaneous, as required for the excited utterance exception."). Moreover, Hansen, had several years' experience with law enforcement, which he refers to in his interview. The trial court did not abuse its discretion in ruling Hansen's recorded statement did not fall within the excited utterance exception.

Nor did the trial court abuse its discretion in rejecting Hansen's argument that the statement should be admissible under the residual exception to the hearsay rule. The residual exception provides:

A statement not specifically covered by any of the exceptions in rules 5.803 or 5.804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Iowa R. Evid. 5.807. Under the residual exception, the proponent of the evidence must show trustworthiness, materiality, necessity, service of the interests of justice, and notice. *See State v. Neitzel*, 801 N.W.2d 612, 622–23 (Iowa Ct. App. 2011). Hansen did not establish these factors; we observe specifically he provided no notice in advance of trial of his intent to offer his statement. The residual exception does not offer a broad license to admit hearsay statements not covered by delineated exceptions; it is to be used "very rarely and only in exceptional circumstances." *State v. Brown*, 341 N.W.2d 10, 14 (Iowa 1983). This is not such an exceptional circumstance. The trial court did not abuse its discretion in declining to admit the recorded interview into evidence.

***D. Chain of custody objection.*** Hansen contends the district court improperly overruled his foundation and chain-of-custody objections to testimony by DCI criminalist Victor Murillo, concluding a spent shell casing had been fired from the .40-caliber handgun found at Hansen's home. Unless there is a clear abuse of discretion, we will not overturn a ruling of the district court determining

whether the State has shown the chain of custody necessary for admission of physical evidence. *State v. Biddle*, 652 N.W.2d 191, 196 (Iowa 2002).

Hansen contends there is a gap in the chain of custody of the handgun and the shell casing because Agent Uhlmeyer, to whom Agent Sandhu and Trooper Grier turned over the items, did not testify. Our supreme court has observed:

> It is true that "[f]ailure to account for continuous custody or to negate any reasonable probability of tampering or substitution of evidence ordinarily is fatal to the State's case." However, to establish a chain of custody adequate to justify admission of physical evidence, the State must show only "circumstances making it reasonably probable that tampering, substitution or alteration of evidence did not occur. Absolute certainty is not required." The burden is heavier when the evidence offered is an item that is very susceptible to tampering, like drugs. When the district court has determined that the State has established a sufficient foundation for the admission of the physical evidence, any speculation to the contrary affects the weight and not the admissibility of the evidence.

*Id.* at 196-97 (citations omitted).

"[I]n establishing a chain of custody adequate to justify admission of physical evidence, the State only need show circumstances making it reasonably probable that tampering, substitution or alteration of evidence did not occur." *State v. Bakker*, 262 N.W.2d 538, 542-43 (Iowa 1978). Agent Sandhu testified to the location where the .40-caliber handgun and the spent shell casing were found in Hansen's kitchen. Photographs of the items were introduced. Agent Sandhu testified he packaged the items and turned them over to Agent Uhlmeyer who sent them to the DCI laboratory for analysis. There is no suggestion of any tampering and no evidence the individuals who seized the evidence were improperly motivated or unreliable. We find no clear abuse of discretion here.

***E. Motion for new trial.*** Finally, Hansen contends that "at the very minimum," he should be awarded a new trial because the weight of the evidence was that he did not act with malice aforethought when he fired the handgun. "A verdict is contrary to the weight of the evidence where a greater amount of credible evidence supports one side of an issue or cause than the other." *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (internal quotation marks omitted). The district court has considerable discretion when determining a motion for new trial under the weight-of-the-evidence test. *Id.* "Except in the extraordinary case where the evidence preponderates heavily against the verdict, trial courts should not lessen the jury's role as the primary trier of facts and invoke their power to grant a new trial." *Id.* Here, the evidence does not preponderate heavily against the verdict, and we find no abuse of discretion in the district court's denial of the motion for new trial.

**AFFIRMED.**