# IN THE SUPREME COURT OF IOWA

No. 08–0859

Filed July 9, 2010

**STATE OF IOWA,**

Appellee,

vs.

**VICTOR SERRATO,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, Mark J. Smith, Judge.

The State seeks further review of the court of appeals opinion reversing the defendant's convictions for first-degree murder and nonconsensual termination of a human pregnancy. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich and Laura M. Roan, Assistant Attorneys General, Gary R. Allison, County Attorney, and Alan R. Ostergren, Assistant County Attorney, for appellee.

**BAKER, Justice**.

The State seeks further review of the court of appeals opinion reversing the defendant, Victor Serrato's, convictions for first-degree murder and nonconsensual termination of a human pregnancy. The State claims the court of appeals erred in finding there was insufficient evidence establishing that any of the conduct constituting the defendant's alleged offenses had occurred in Iowa, and thus the State had failed to establish territorial jurisdiction. Serrato resists the State's claim and further argues that the State failed to prove he was even the individual who killed the victim, Mimi Carmona, and ended her pregnancy. After reviewing all the evidence, we find that, taken as a whole, substantial evidence exists to support the jury's verdict and to prove beyond a reasonable doubt that Iowa had territorial jurisdiction to prosecute Serrato for first-degree murder and nonconsensual termination of a human pregnancy. Serrato's conviction is affirmed.

## I. Background Facts and Proceedings.

On November 9, 2006, Victor Serrato was initially charged by trial information with the first-degree murder of Mimi Carmona in violation of Iowa Code sections 707.1, 707.2(1), and 707.2(2) (2005); kidnapping in the first degree in violation of Iowa Code sections 710.1 and 710.2; and nonconsensual termination of a human pregnancy in violation of Iowa Code section 707.8(1).[1] All of these charges stem from a series of events that took place between Serrato, Carmona, and Serrato's pregnant girlfriend on the evening of October 21 and the early morning hours of October 22. Many of these events took place in Muscatine, Iowa, a town

---

[1]The State later amended the trial information and dropped the kidnapping charge and the felony murder alternative of the first-degree murder charge.

bordering the Mississippi River. Carmona's body, however, was found in a rural area in Illinois, directly across the river from Muscatine.

Serrato filed a motion to dismiss the remaining charges claiming the State could not prove beyond a reasonable doubt that he murdered Carmona or that any of his alleged crimes occurred, in whole or in part, within the State of Iowa. The motion was denied.

A jury trial was held, and after the State rested its case, Serrato moved for a verdict of acquittal, arguing that the State provided insufficient evidence that Serrato caused the death of Carmona and, alternatively, that any part of the offenses charged took place in Iowa. The State resisted arguing there was sufficient evidence tying Serrato to the murder and that there was sufficient evidence from which the jury could infer that his intent to kill with premeditation and malice aforethought were formed in Iowa. The district court denied Serrato's motion.

The jury found Serrato guilty of all counts. Serrato filed a motion in arrest of judgment and a motion for a new trial, claiming the evidence was insufficient to prove the crimes took place in Iowa and insufficient to convict him of the crimes. The court denied his motions. He appealed.

The appeal was routed to the court of appeals. The court of appeals concluded that the element of intent was sufficient to invoke the state's territorial jurisdiction; however, the court found the State failed to present sufficient evidence that Serrato formed the intent to kill and malice aforethought necessary to invoke Iowa's territorial jurisdiction while he was in Iowa. The court reversed the jury's verdict and remanded for dismissal. The State then filed an application for further review with this court, which we granted.

## II. Discussion and Analysis.

**A. Scope of Review.** The principles governing our review of a district court's denial of a criminal defendant's motion for judgment of acquittal are well-established. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law. *Id.* A guilty verdict must be supported by substantial evidence. *Id.*

> " 'Substantial evidence' is that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." In conducting our review, we consider all the evidence, that which detracts from the verdict, as well as that supporting the verdict.

*State v. Hagedorn*, 679 N.W.2d 666, 668–69 (Iowa 2004) (quoting *State v. Pace*, 602 N.W.2d 764, 768 (Iowa 1999)). "However, in making such determinations, we also view the 'evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.' " *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005) (quoting *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002)).

**B. Sufficiency of the Evidence to Prove Serrato Was the Perpetrator.** In his appeal, Serrato claimed that the State failed to present sufficient evidence that he was the perpetrator of the charged offenses, and his convictions should be vacated. After reviewing all of the evidence in the record, we conclude that the jury's verdict is supported by substantial evidence.

The jury found Serrato guilty of first-degree murder and nonconsensual termination of a human pregnancy. The jury was presented with the following evidence. On October 21, sometime

between 11:00 and 11:30 p.m., friends Esmerelda Perales and Angelica Chavez went to the Escorpion Bar in Muscatine, Iowa. At the bar, the women encountered Chavez's former friend and roommate Carmona. Both Carmona and Chavez were pregnant at the time. Carmona approached the women and tried to give Chavez a hug, but Chavez put up her hand blocking Carmona's attempt. Carmona asked Chavez if she was mad at her, to which Chavez replied, "I have nothing to say to you." A few minutes later, Carmona slapped Chavez, and a fight ensued. The fight was quickly broken up by the bartender and the owner of the establishment. Carmona was escorted outside by the bartender but ran back inside a few minutes later to continue the fight. Chavez and Perales left the bar soon afterwards. Carmona remained at the Escorpion Bar.

The two women were fighting over the paternity of their unborn babies. During the argument, Perales overheard Carmona say to Chavez, "We have the same baby" and "[o]ur babies have the same blood running through their veins." To these comments Chavez replied, "Whose blood? Chutarro's or Juan's?" Chutarro is the nickname of Serrato, Chavez's boyfriend at the time. Juan was the defendant's brother.

On the drive home, Chavez and Perales decided to call Serrato to tell him about the fight with Carmona. After several failed attempts to contact Serrato on his cell phone, the women decided they were going to drive to West Liberty, Iowa, where Serrato was attending a dance. However, Serrato called Perales's cell phone just as the women reached the outskirts of Muscatine. Phone records place this call at 12:47 a.m. on October 22. Perales relayed the details of the physical altercation to Serrato. Serrato told the women to meet him at Chavez's house in Muscatine. Perales and Chavez arrived at the house around 1:00 a.m.

Serrato arrived at Chavez's house sometime between 1:00 and 1:30 a.m. Serrato was upset when he arrived at the residence. Neither Chavez nor Perales would tell him more about the altercation at the Escorpion Bar. Perales estimated that he was at the residence for about ten minutes; he then left without telling either woman where he was going.

At around 1:30 or 1:45 a.m., Marciela Garcia, a friend of Carmona, and four passengers in her car, saw Carmona with Serrato in the parking lot of the Escorpion Bar. Serrato and Carmona were standing beside a little black truck. Serrato was on the driver's side of the truck and Carmona on the passenger side. Garcia got out of her car and approached Carmona. When Carmona turned around, Garcia could see she had been crying. Garcia asked Carmona why she was upset. Carmona replied, "Because this bastard is denying my baby" and pointed to Serrato. Serrato, who had been on the driver's side of the truck, came around the vehicle and approached Carmona at this point. He mumbled something in Spanish to the effect of, "Are you sure this is my baby?" whereupon Carmona smashed her cell phone into his face and kicked him in the shin. The couple physically struggled, Carmona attempting to hit Serrato and he attempting to grab Carmona's hands and push her against the truck. At this point, a passenger in Garcia's car, a man named Dago, got out of her car and grabbed Serrato, throwing him to the ground. Dago told Serrato, "You're never to hit a woman when—especially when she's pregnant."

Fearing that the police would be called, Garcia told Dago to get back into her car. Before leaving, Garcia told Carmona not to move, that she would be right back. Garcia drove to a convenience store approximately a block away where Dago was supposed to meet a friend

to catch a ride to Iowa City.  Garcia left Dago there and returned to the parking lot of the Escorpion Bar, but Carmona, Serrato, and the little black truck were gone.

According to Perales, Serrato returned to Chavez's home approximately twenty-five minutes after leaving or sometime around 2:00 or 2:15 a.m.  Chavez also testified Serrato was gone for approximately thirty minutes.  She stated that when he returned he had a scratch on his face and several scratches on his arms.  Perales then left Chavez's residence and returned home.  Cell phone records show that Serrato received a call from Chavez at 2:04 a.m., and Chavez received a call from Serrato at 2:06 a.m.  According to Chavez, Serrato spent the rest of the night at her house, and the couple slept in until about 1:00 p.m. the next day.

At around 6:30 p.m. the next evening, Carmona's body was found by two motorists in a rural area in Illinois across the Mississippi River from Muscatine.  Her body had been thrown in a ditch, her clothes were partially pulled off, and her body was badly bruised and scraped.  A plastic bag was caught in her hair.  Her shoes, a beer bottle with her DNA on it, and a postal receipt later connected to the defendant's brother, Edgardo Serrato, were scattered near the body.

Forensic pathologist, Mark Peters, performed an autopsy on Carmona's body and determined the cause of Carmona's death to be asphyxia due to manual strangulation.  He further opined that a "great deal of force" was used to kill Carmona, as the hyoid bone in her neck was broken.  She had a crushing injury to her liver, a hemorrhage underneath her scalp, and several dark abrasions on her abdomen.  She was approximately six months pregnant at the time of her death, and the fetus was dependent upon Carmona's circulation and died as a result of

her death. Based upon lividity, Peters testified that her death could have occurred anytime before 6:00 a.m. on October 22.

The police launched an investigation into Carmona's death. Serrato was interviewed several times. At first, Serrato claimed he had not seen Carmona in the last three to four weeks, but eventually he confessed to investigators that he had argued with her in the parking lot of the Escorpion Bar on the night of her disappearance. However, he claimed he had left her in the parking lot with another Latino man. He also told police he had sex with her eight months prior to her murder.

The plastic bag found caught in Carmona's hair was sent for DNA testing. No fingerprints were found, however, dried flakes of blood were found inside the bag. The flakes contained a mixture of DNA from two different sources. The DNA matched the profiles of both Carmona and Serrato. Testing also revealed that Serrato was not the father of Carmona's baby. The authorities located the little black truck Carmona was last seen standing beside in the parking lot of the Escorpion Bar in a police impound lot in Chicago; however, the police were not able to obtain any useful evidence from the vehicle which had been exposed to months of winter weather.

The jury had the following evidence to support its conclusion that it was Serrato who killed Carmona. First, Serrato had ample motive. Carmona had just assaulted Serrato's pregnant girlfriend and accused him of being the father of an unwanted child. Second, he had the opportunity to kill Carmona. Serrato was the last person seen with her alive. In addition, his whereabouts were unaccounted for during a period of time that coincides with her time of death, a gap of approximately twenty-five minutes. Finally, there was physical evidence linking Serrato to Carmona's death. His DNA was comingled with Carmona's blood in

the plastic bag found tied to her hair. Serrato points out several inconsistencies in the evidence; however, when viewing the evidence in the light most favorable to the State, we find that substantial evidence exists upon which the jury could find that Serrato was the perpetrator of the offenses charged beyond a reasonable doubt.

**C. Territorial Jurisdiction.** Alternatively, Serrato argued, and the court of appeals found, that the evidence was insufficient to prove Serrato formed the intent to kill and malice aforethought necessary while in Iowa to invoke the state's territorial jurisdiction. We disagree. Territorial jurisdiction to prosecute a criminal offense generally rests in the courts of the state where the offense was committed. *State v. Liggins*, 524 N.W.2d 181, 184 (Iowa 1994). It is an essential element of every crime, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution requires the State to prove it beyond a reasonable doubt. *Id.* at 184–85; *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787, 61 L. Ed. 2d 560, 571 (1979). Iowa's criminal jurisdiction statute is found in Iowa Code section 803.1. This section provides, in pertinent part:

> 1. A person is subject to prosecution in this state for an offense which the person commits within or outside this state, by the person's own conduct or that of another for which the person is accountable, if:
>
> (a) The offense is committed either wholly or partly within this state.
>
> . . . .
>
> 2. An offense may be committed partly within this state if *conduct which is an element of the offense, or a result which constitutes an element of the offense,* occurs within this state. If the body of a murder victim is found within the state, the death is presumed to have occurred with the state
> . . . .

Iowa Code § 803.1 (emphasis added). Carmona's body was found in Illinois; therefore, the presumption in the second sentence of subsection (2) does not apply.

Iowa's criminal jurisdiction statute expressly provides for prosecution of offenses committed partly within Iowa. *Id.*; *see also State v. Wedebrand*, 602 N.W.2d 186, 189 (Iowa Ct. App. 1999). Under this language, the State need only prove the occurrence in Iowa of one of the essential elements of first-degree murder beyond a reasonable doubt in order to confer territorial jurisdiction upon the State of Iowa. *See Liggins*, 524 N.W.2d at 184–85 (declaring that the state must prove territorial jurisdiction beyond a reasonable doubt). "A constituent element of a criminal offense may be either an actus reus element or a mens rea element." *State v. Anderson*, 695 N.W.2d 731, 747 (Wis. 2005).

The jury found Serrato guilty of first-degree murder and nonconsensual termination of a human pregnancy. To commit murder in the first degree, Serrato must have acted with malice aforethought and have killed Carmona willfully, deliberately, and with premeditation. Iowa Code §§ 707.1, .2(1). The offense of nonconsensual termination of a human pregnancy requires that Serrato have terminated a human pregnancy without the consent of the pregnant person while committing a forcible felony. *Id.* § 707.8(1). The fetus was dependent upon the circulation of Carmona's body and died as a result of her death; therefore, the forcible felony required by Iowa Code section 707.8(1) would be the murder of Carmona.

In analyzing the issue of Iowa's territorial jurisdiction, the court of appeals focused on the element of specific intent. While specific intent is a necessary element of first-degree murder, it is not the only state–of–mind element required by Iowa's first-degree murder statute. To commit

first-degree murder in Iowa one must not only have the specific intent to kill, but must also act with malice aforethought. *Id.* § 707.1; *see also State v. Bentley*, 757 N.W.2d 257, 264 (Iowa 2008) ("Malice aforethought is an essential element of first-degree murder."). Unlike specific intent, malice aforethought is

> "a fixed purpose or design to do some physical harm to another existing prior to the act complained of; it need not be shown to have existed for any length of time before, but only requires such deliberation as *makes a person appreciate and understand at the time the act is committed its nature and probable consequences* as distinguished from an act done in the heat of passion . . . ."

*State v. Gramenz*, 256 Iowa 134, 142, 126 N.W.2d 285, 290 (1964) (quoting *State v. Hofer*, 238 Iowa 820, 833, 28 N.W.2d 475, 482 (1947)). Malice to support a first-degree murder conviction "must be 'formed before . . . the injury' . . . . [and] must result in the homicidal act." *Bentley*, 757 N.W.2d at 265 (quoting *Hofer*, 238 Iowa at 833, 28 N.W.2d at 482).

Because it is a state of mind, malice aforethought often evades direct evidence. *See, e.g., State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (declaring states of mind are difficult to prove by direct evidence). However, similar to intent, malice aforethought may be inferred by conduct. *Compare id.* ("Intent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." (quoting *State v. Erving*, 346 N.W.2d 833, 836 (Iowa 1984))), *with Gramenz*, 256 Iowa at 142, 126 N.W.2d at 290 (stating evidence of malice aforethought "may be express or implied from the acts and conduct of the defendant"). Thus, when a person's

state of mind, i.e., knowledge, intent, or malice aforethought, is an essential element of the crime charged, acts by that person occurring within Iowa, which indicate his or her state of mind at the time, constitute conduct upon which the requirements of section 803.1 are satisfied. *See Wedebrand*, 602 N.W.2d at 189 (stating "proof of the requisite intent or malice aforethought may be accomplished by inferences made from the acts and conduct of the defendant and the means used in doing the wrongful and injurious acts"); *see also Anderson*, 695 N.W.2d at 747 (noting it is sufficient "that the defendant committed an act in this state that manifests an intent to kill").

We agree with the court of appeals, that under the language of Iowa Code section 803.1, conduct or actions occurring in Iowa which establish a mens rea element of the offense are sufficient to subject a defendant to Iowa's territorial jurisdiction. *See, e.g., Wedebrand*, 602 N.W.2d at 189 (finding that Iowa's territorial jurisdiction may be properly invoked by evidence of conduct which evidences the intent to kill).

**D. Sufficiency of the Evidence to Establish Iowa's Territorial Jurisdiction.** To determine whether evidence is sufficient to prove an element of the crime, the question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Casady*, 491 N.W.2d at 787 (quoting *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789, 61 L. Ed. 2d at 573). Our review "must be based on all of the evidence in the record," and the evidence presented "must at least raise a fair inference of guilt as to each essential element of the crime." *Id.*

There were no eyewitnesses to Carmona's death, her body was found in Illinois, and the State of Iowa did not produce any evidence

documenting the exact location where Serrato allegedly strangled Carmona. A review of the evidence, however, reveals that a jury could find Serrato engaged in the following conduct on the evening of October 21 and the early morning of October 22.

1. Serrato called Perales's cell phone at 12:47 a.m. on October 22. Serrato told the women to meet him at Chavez's house located at 514 Spring Street in Muscatine.

2. Serrato arrived at Chavez's house sometime between 1:00 and 1:30 a.m.

3. Serrato left Chavez's house sometime between 1:10 and 1:40 a.m.

4. At around 1:30 or 1:45 a.m., Marciela Garcia, a friend of Carmona's, and four passengers in her car, saw Carmona and Serrato physically fighting in the parking lot of the Escorpion Bar.

5. At approximately 1:50 a.m. Garcia left the parking lot of the Escorpion Bar. Serrato and Carmona were still in the Escorpion parking lot.

6. Cell phone records show that Serrato received a call from Chavez at 2:04 a.m. and Chavez received a call from Serrato at 2:06 a.m.

7. Serrato returned to Chavez's home approximately twenty-five minutes after leaving or sometime around 2:00 or 2:15 a.m.

From these facts, the jury could have inferred that from the time Serrato was informed of the physical altercation between Chavez and Carmona, sometime shortly before 1:00 a.m., he knew he had a problem that must be addressed. The situation was only exacerbated when Serrato arrived at Chavez's home to find an upset pregnant girlfriend and further escalated when Serrato confronted Carmona in the parking lot of the Escorpion Bar, culminating in a screaming match with Carmona that turned physical and had to be broken up by a third party. From the timeline, the jury could also find that Serrato's presence was only

unaccounted for from approximately 1:50 a.m. until approximately 2:15 a.m. It was within this twenty-five minute window that the State posits Serrato formed the intent to murder Carmona, murdered Carmona, made a call to Chavez at 2:04 a.m. and received a call from Chavez at 2:06 a.m., traveled to Illinois, and returned to Chavez's home in Iowa.

At trial, Dr. Peters testified that death by strangulation takes approximately three to four minutes, a relatively short amount of time. While Carmona also had a crushing injury to her liver, a hemorrhage underneath her scalp, and several dark abrasions on her abdomen, it is unclear how many times she needed to be struck to cause these injuries or the length of time required to cause these injuries. From the evidence presented, the jury could have inferred that the death occurred prior to the two phone calls made between Chavez and Serrato. This timeline leaves a very short window of time for Serrato to form the malice aforethought and intent necessary to kill Carmona, murder her, and be back in Muscatine by no later than 2:15 a.m.

We find there is sufficient evidence for the jury to reasonably infer that Serrato formed " 'a fixed purpose or design to do some physical harm to [Carmona]' " when he took her from the parking lot of the Escorpion Bar sometime between 1:50 a.m. and 1:53 a.m. *Gramenz*, 256 Iowa at 142, 126 N.W.2d at 290 (quoting *Hofer*, 238 Iowa at 833, 28 N.W.2d at 482). Just prior to the couples' departure, several witnesses had seen another man stop Serrato from striking Carmona. This is specific conduct from which the jury could infer Serrato's intent to harm Carmona.

As in provocation cases, the issue is "whether 'the blood has had time to cool.' " *Finn v. Stoddard*, 179 Iowa 904, 910, 162 N.W. 1, 3 (1917) (quoting *Thrall v. Knapp*, 17 Iowa 468, 471 (1864)). We believe

that human nature is such that anger does not immediately subside, and the jury could have inferred that Serrato hatched a plan to harm Carmona, evidencing malice aforethought, while still in the parking lot of the Escorpion Bar in Muscatine, Iowa. The jury could further infer that as part of that plan Serrato enticed Carmona or forced her to take a ride with him in his vehicle with the intent to kill her and terminate the pregnancy. *See, e.g., People v. Betts*, 103 P.3d 883, 893 (Cal. 2005).

Iowa's jurisdiction statute "is satisfied if the defendant, with the requisite intent, does a preparatory act in [Iowa] that is more than a de minimus act toward the eventual completion of the offense." *Id.* Serrato's act of confronting Carmona, physically struggling with her, and then leaving the parking lot with her were not merely de minimus acts, but ultimately furthered the completion of the charged offense, first–degree murder. *See id.* (finding preparatory acts sufficient to establish jurisdiction over a defendant's crimes when the acts furthered the completion of the charged offense by removing the victims from the protection of others and providing the defendant with the opportunity to commit the crimes).

We find that, taken as a whole, the circumstantial evidence—Serrato's motive to kill Carmona (an unwanted pregnancy), the physical altercation between Serrato and Carmona in Iowa immediately before her murder, the act of enticing or forcing her into his vehicle, and the short timeline—provide substantial evidence to support an inference that Serrato engaged in conduct which manifested malice aforethought to kill Carmona and terminate the pregnancy while in the State of Iowa. When viewing the evidence in the light most favorable to the State, this constitutes substantial evidence to prove the jurisdictional element beyond a reasonable doubt. Iowa therefore had territorial jurisdiction to

prosecute Serrato for first-degree murder and nonconsensual termination of a human pregnancy.

### III. Motion for New Trial.

Serrato also claims that the district court's denial of his motion for new trial was in error because the verdict was contrary to the weight of the evidence. The standard of review on a motion for a new trial is different than that required for a motion for judgment of acquittal. *State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998). On a motion for judgment of acquittal we view the evidence in the light most favorable to the state. *Id.*

> "On a motion for new trial, however, the power of the [trial] court is much broader. It may weigh the evidence and consider the credibility of witnesses. If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted."

*Id.* at 658–59 (quoting 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure § 553, at 245–48 (2d ed. 1982)). We review the district court's ruling on a motion for a new trial for an abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). To establish an abuse of discretion, Serrato "must show that the district court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* Our "review is limited to a review of the exercise of discretion by the trial court." *Id.* at 203. This discretion "should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Ellis*, 578 N.W.2d at 659.

The jury determined that Serrato was the perpetrator of the offenses charged and that Serrato engaged in conduct which manifested malice aforethought to kill Carmona and terminate the pregnancy while in the State of Iowa. We find the trial court properly applied the law and

determined that the jury's guilty verdict was not contrary to the weight of the credible evidence. *Id.* We hold that it was within scope of the trial court's discretion to deny Serrato's motion for new trial.

**IV. Disposition.**

After reviewing all the evidence, we find that, taken as a whole, substantial evidence exists to support the jury's verdict finding Serrato guilty of first-degree murder and nonconsensual termination of a human pregnancy. We conclude that under the language of Iowa Code section 803.1, conduct or actions occurring in Iowa which establish a mens rea element of the offense are sufficient to subject a defendant to Iowa's territorial jurisdiction. We also conclude that sufficient evidence exists to prove beyond a reasonable doubt that Iowa had territorial jurisdiction to prosecute Serrato for first-degree murder and nonconsensual termination of a human pregnancy, and that the trial court did not abuse its discretion in denying Serrato's motion for a new trial. We, therefore, vacate the court of appeals' contrary decision and affirm Serrato's conviction.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**