# IN THE COURT OF APPEALS OF IOWA

No. 16-0485
Filed June 7, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JOHN DALE METZGER,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Palo Alto County, Don E. Courtney,

Judge.


A defendant appeals his conviction for going armed with intent.

**AFFIRMED.**


Jack B. Bjornstad of Jack Bjornstad Law Office, Okoboji, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant

Attorney General, for appellee.


Considered by Tabor, P.J., Mullins, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**TABOR, Presiding Judge.**

The question in this appeal is whether the State proved beyond a reasonable doubt that John Metzger drove with his rifle to a farm field where he shot at a crop-dusting plane—committing the crime of going armed with intent. Because the trial record contains substantial circumstantial evidence to support Metzger's conviction, we decline to disturb the jury's verdict.

## I. Facts and Prior Proceedings

For at least twelve years, Metzger felt harassed by planes from Steier Ag Aviation Service flying so low over his farm that they would "shake the house." Around 2005 or 2006, Metzger telephoned Elmer Steier, the company's founder, to complain a crop-duster had flown too close to Metzger's buildings. Steier recalled Metzger saying "he was so upset that if an airplane flew close to his building site, he would shoot them down." Steier took Metzger's threat seriously and told his pilots to steer clear of Metzger's property.[1]

But Metzger's aggravation returned bright and early on July 31, 2015. He awoke at 6:40 that morning when his "house start[ed] shaking." He ran out his front door while still wearing his bed clothes, looked up, and "saw the plane." He recalls leaving his house at 7:10 a.m. and driving to the Steier's airfield.[2] Metzger testified he was "hoping to see what plane it was and write down the numbers" but he "couldn't make out the numbers" because he "was too far away"

---

[1] Metzger told investigators: "[Steier] . . . said he'd put a stop to it. Well, it's just gotten worse."

[2] An employee at the aviation service noticed a tan Chevy Impala driving by the hangars at a slow speed early that morning.

and "didn't have binoculars." Metzger testified he was "thinking of calling" the Federal Aviation Administration.

Meanwhile, pilot Derrick Frideres started his shift at Steier Ag Aviation just before 7:00 that morning. His job was to apply insecticide to kill aphids in customers' fields by flying a yellow and white Cessna Model 188 aerial spray plane. When spraying, the Cessna would fly roughly twenty feet off the ground at 110 miles per hour. Just before 8:30 a.m., Frideres saw a "pewter or tan car sitting at the intersection by the east end of the runway." The pilot thought it was "odd" to see the car parked in that location. Frideres testified:

> [O]nce I had seen the car, I had made loops around it which is something we do because we really don't want a car to be around when we're spraying . . . so I circled around to let him know I was there, hoping maybe he would just drive off.

The pilot saw the driver looking up through the windshield before the car finally moved about one-quarter mile, pulling into a "field drive." At that point, Frideres returned to his work and lost sight of car. A few minutes later, Frideres was "coming up over the trees" at the end of the field when he heard a loud "metallic pop." The pilot thought something hit the plane. After hearing the popping noise, Frideres saw the tan car driving down the road. He then finished spraying the field and landed the Cessna.

After landing at Steier's airfield, Frideres met with the company's current owner, Dennis Meyer. The pilot said: "Denny, I think somebody shot my plane." Meyer and Frideres located a hole in the right wing flap. Meyer testified the damage was "awfully close to the fuel cell on the airplane and would have been awfully close to the cabin where the pilot was sitting."

Meyer called authorities, who focused their investigation on Metzger because of his prior threat against Steier Ag Aviation. In interviews with law enforcement, Metzger acknowledged he left his house early to see "what the heck was going on" and he "kept driving around the gravel roads to see how many [crop-dusting planes] were flying out there." Metzger said he did "park and watch" the crop-duster for "quite a while" that morning. But he denied shooting at Frideres's plane.

Metzger told investigators he transported his .22 caliber Marlin rifle and 12-gauge shotgun in the backseat of his car on occasion "with a blanket over the top of them." He described reaching into the backseat for ammunition, loading the rifle, and shooting at skunks from his car. Metzger then had a telling exchange with the FBI agent conducting the interview. The agent expressed "huge concern" for the safety of the pilot in the plane that was damaged, telling Metzger, "I'm trying to figure out why you were there, all these things occurred. You do have weapons in your car." Metzger replied: "Because this has been going on for twelve years. . . . That's why I was following him around, to see if he was gonna do that again."

Investigators seized the Marlin rifle and three other long guns from the closet of Metzger's house while executing a search warrant. Law enforcement also sent the Cessna's damaged wing to be examined by Victor Murillo, a firearm and tool-mark expert with the Iowa Division of Criminal Investigation. Swabs taken of the entry and exit points on the hole revealed the presence of lead. Murillo testified: "[I]t's consistent with a lead bullet, but I can't tell you specifically it was definitely a lead bullet." The State's expert did not believe the damage

was caused by a bird or tree branch. At the crime lab, Murillo test fired .22-caliber lead-nosed bullets through the same metal flap and opined the holes were "consistent" with the damage observed to the wing when it arrived at his office. Investigators found eight cartridge casings on the floor of Metzger's car—five on the driver's side and three on the passenger's side. Murillo testified it was "certainly possible" they could have come from the Marlin rifle.

In August 2015, the State filed a trial information charging Metzger with four counts: (I) terrorism, a class "B" felony, in violation of Iowa Code section 708A.2 (2015); (II) intimidation with a dangerous weapon, a class "C" felony, in violation of section 708.6; (III) stalking with a dangerous weapon, a class "D" felony, in violation of section 708.11; and (IV) going armed with intent, a class "D" felony, in violation of section 708.8. After hearing the evidence at Metzger's November 2015 trial, the district court granted the defense motion for judgment of acquittal on the first three counts, leaving only the going-armed-with-intent offense for the jury's consideration. The jury returned a guilty verdict on that count. The district court sentenced him to an indeterminate five-year term and a fine of $750. Metzger now appeals.

## II. Scope and Standard of Review

Metzger asserts the State's proof was insufficient to convict him. We review such sufficiency challenges for correction of legal error. *See State v. Alvarado*, 875 N.W.2d 713, 715 (Iowa 2016). We analyze the evidence in the light most favorable to the jury's verdict to determine if, when considering the evidence as a whole, "a reasonable person could find guilt beyond a reasonable doubt." *Id.* (quoting *State v. Pearson*, 514 N.W.2d 452, 456 (Iowa 1994)). In

making this determination, we view circumstantial evidence as no less probative than, and in some instances as superior to, direct evidence. *See State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979). Inherent in our standard of review of criminal verdicts is the recognition the jury was free to reject certain evidence and to credit other evidence. *State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994).

### III.     Analysis

The State had the burden to prove, beyond a reasonable doubt, the following elements of going armed with intent:

> 1. On or about the 31st day of July, 2015, in Palo Alto County, Iowa, [Metzger] was armed with a Marlin .22 caliber rifle.
> 2. A Marlin .22 caliber rifle is a dangerous weapon . . . .
> 3. [Metzger] was armed with the specific intent to use the Marlin .22 caliber rifle against another person.
> 4. While armed with the Marlin .22 caliber rifle, [Metzger] moved from one place to another.

On appeal, Metzger challenges the State's proof of the first, third,[3] and fourth elements, alleging the State relied on nothing more than "suspicion, speculation and conjecture." Metzger points out no witness saw him carry the rifle from place to place on the day in question, no witness saw him shoot the gun, and the State's expert could not conclusively say a bullet caused the hole in the plane's wing.

The State counters that its evidence was sufficient for the jury to find Metzger acted on his "long-standing grudge" against the crop-dusting pilots. The

---

[3] In moving for judgment of acquittal at trial, defense counsel challenged the specific-intent element of the offense, arguing the State offered no proof Metzger "intended to use a dangerous weapon against Derrick Wayne Frideres. They didn't know each other." Metzger does not renew this particular argument on appeal.

State highlights the following incriminating facts: (1) Metzger admitted previously to driving with his Marlin rifle and ammunition in the car, (2) Metzger told interviewers he shot a skunk from the car the day before the incident being investigated and again when he returned home from watching the planes, and (3) investigators found eight empty casings in the car that were consistent with being fired from the Marlin rifle. The State also emphasizes Metzger's response to the FBI agent when Metzger appeared to acknowledge he had weapons in his car because "this has been going on for twelve years."

The jury was entitled to disbelieve Metzger's denial that he shot at the crop-duster and to conclude it was not mere coincidence that Metzger was tracking the plane for two hours that morning and was admittedly in the immediate vicinity just before the pilot heard the metallic popping noise. *See State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996) (upholding jury's verdict by "giving the State all reasonable inferences and presumptions that the evidence will bear"). A reasonable fact finder could also conclude from criminalist Murillo's testimony that the hole in the Cessna's wing was caused by a lead bullet shot by a .22 caliber rifle like the Marlin in Metzger's possession. Finally, the jury was free to believe the cartridge casings in Metzger's car were left—not from shooting at skunks—but from Metzger acting on his intent to exact revenge against the crop-dusting pilots who he perceived to have habitually "buzzed" his property for more than a decade. *See State v. Serrato*, 787 N.W.2d 462, 471 (Iowa 2010) (considering defendant's motive as supportive of circumstantial evidence when upholding verdict).

When taken as a whole, the circumstantial evidence, viewed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt that Metzger committed the offense of going armed with intent.

**AFFIRMED.**