# IN THE COURT OF APPEALS OF IOWA

No. 20-1173
Filed February 16, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TODD MICHAEL MULLIS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Delaware County, Thomas A. Bitter,

Judge.


        Todd Mullis appeals his conviction for first-degree murder.  **AFFIRMED.**


        Aaron Hamrock and Robert Larson of McCarthy & Hamrock, P.C., West

Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.


        Heard by Schumacher, P.J., Badding, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**GAMBLE, Senior Judge.**

Todd Mullis appeals his conviction for first-degree murder following the death of his wife, Amy Mullis. On appeal he challenges the denial of his motions for judgment of acquittal and new trial. We affirm.

## I. Facts and Prior Proceedings

Todd was passionate about farming. He loved farm life and worked very hard. Todd purchased his first farm in 1999. Eventually, Todd's operation grew to three farms and part of another one. Todd's farm includes two hog barns on his home place.

Todd met Amy in 2003 at the Delaware County Fair. They married in 2004. Following the marriage, Amy moved onto Todd's farm. However, Amy worked off the farm in healthcare. Eventually the couple had three children.

But they all also had their challenges. Around 2013, Amy had an affair with someone she met through work. The couple entered counseling at the encouragement of a mutual friend and reconciled. And Amy left her job and became a stay-at-home parent. Amy had to be accountable to Todd and let him know if she had to go somewhere. According to Amy's step-mother, Todd resolved to work things out and told Amy's step-mother, "I'm not going to lose my farm and what I've worked for."

Things came to a head in 2018. The year was full of difficulties. In June, Amy began a second affair, this time with Jerry Frasher, who oversaw the farm's hog operation. Todd became suspicious of the two after reviewing a phone bill and noting a significant amount of contact between Amy and Frasher. So Todd confronted Frasher, who denied the affair, but Todd was unsure whether Frasher

was telling him the truth. So Todd contacted Frasher's wife and shared his suspicions with her. She thought Todd was a little crazy. Todd called back a couple of days later and apologized to both of them. He also shared his suspicions with Amy's step-mother. And Todd questioned their mutual friend, Amy's former coworker, about Amy's behavior and indicated she was acting like she had during her first affair. At one point, their friend suggested the two might be better off not together, but Todd responded, "I have worked for this farm since I was eleven and I will not give it up."

When their mutual friend learned of the affair from Amy she told Amy, "you're putting yourself in a really dangerous situation," and expressed concern stating, "[Todd] is going to kill you" "because Todd is just the person you don't mess with." Their friend was at a work event and heard rumors of the affair, so she told Amy about the rumors, and Amy became upset. Amy then told her where to look for her body should she go missing. Amy contacted another former coworker to see if she had heard rumors of the affair and asked her to stop any that she might hear. Amy explained several times that Todd would kill her if he found out and explained her eldest child, T.M., had told Amy "If [d]ad finds out you're going to have an affair, he'll kill you."

By July, Amy had talked to their mutual friend about leaving Todd, and Amy "was . . . to the point where she felt like she was strong enough to leave on her own" and "[i]t was not so much anymore she would leave for [Frasher], but she would leave on her own." Amy "said she was quietly looking for jobs and somewhere to live." That same month, Amy explained to another friend that Todd did not want to divorce because "he would lose half of everything and it is socially

unacceptable." On another occasion, Amy explained to her that "she was scared of Todd and if he found out about wanting a divorce or an affair, that he would kill her."

Then Amy's grandmother passed away in August. According to Amy's brother, by then Amy was planning to divorce Todd and expected Todd to "flip out." But Amy was worried that T.M. would be angry with her for leaving Todd. Amy asked her brother to store some of their grandmother's furniture so that she would have some when she left Todd. At the end of the month, Todd confided in their mutual friend and explained Amy told him there were rumors about her having an affair and then "she cried for h[ou]rs" and "said she should leave [be]cause we [are] better off without her."

In October Amy's uncle suffered a brain bleed, so Amy was away from Todd and the children frequently to help with her uncle's care. And her absence began to wear on Todd as he had hogs going out, plus the harvest, and had to care for the children at the same time. That month, Todd found a corn rake in the yard and put it in the red shed.

Amy had an outpatient medical procedure on November 6.[1] Upon discharge, Amy had a ten-pound lifting restriction and rested at home for a few days. A friend texted Amy the morning of November 10 to see how she was doing; Amy responded, "Thanks. Okay. Things still very tense around here. Just not sure of anything anymore."

---

[1] The couple's mutual friend described the procedure as an ablation, which she says was performed to treat heavy menstruation.

That morning T.M. and Todd had left the house to check on some hogs offsite. Then they returned to the farmhouse for breakfast that Amy had prepared. After breakfast, T.M. and Todd went out to the north hog barn on the farm. The barn was a large as a football field. At 10:12 a.m., Amy emailed Frasher, "Do you know what I'm doing today? Cleaning fucking light fixtures in the barn. WTF." A few minutes after T.M. and Todd went to the north hog barn, Amy came out to join them. They worked to prepare the barn for incoming infantile hogs.[2] Todd was arranging nipple feeders in the pens. T.M. was bringing heaters from a storage area to the pens. Amy was cleaning light fixtures.

Amy cleaned the fixtures while standing on a five-gallon bucket. T.M. and Todd noticed Amy seemed unsteady, and both asked her if she was alright. Amy continued to work but still appeared unsteady, so both T.M. and Todd suggested she stop working on the light fixtures. Todd suggested instead Amy could go get a pet carrier from the red shed, which was about thirty yards from the front of the hog barn. The pet carrier weighted ten to fifteen pounds. Todd asked Amy to either take the pet carrier to their shop building across the yard or leave it out for them.

T.M. and Todd continued to work in the hog barn for about another hour and a half. After Amy left, T.M. took over cleaning light fixtures. At some point T.M. lost sight of Todd while they were in the hog barn but was unsure of how long that was.[3] T.M. was out of Todd's sight when he stepped into a small office in the

---

[2] The two youngest children remained inside the home.
[3] Initially T.M. told investigators that he was with Todd the entire time. Then at a deposition, T.M. said he was out of Todd's sight for one minute and forty seconds.

corner of the barn to get a drink of water a couple of times. When Todd noticed the pet carrier was not in the yard or in front of the shop, he sent T.M. to get the pet carrier out of the red shed.

T.M. went into the red shed and found Amy on her hands and knees facedown with the corn rake sticking out of her back. T.M. yelled for Todd. Amy was unresponsive; T.M. checked whether Amy had a pulse or was breathing. Todd ran over and told T.M. to get the truck and bring it over. Todd did not render aid or call 911 while he waited for T.M. When T.M. brought the truck over, he saw Todd pull the corn rake out of Amy's back. T.M. got in the passenger side of the truck, Todd put Amy on T.M.'s lap, and they set off for the hospital.

While driving, Todd called 911 at 12:01 p.m. and said Amy fell on a corn rake. The operator told Todd to pull over and perform CPR, which Todd did. Deputy Luke Thomsen arrived on the scene and took over CPR. He asked Todd what happened, and Todd told him they found her with a corn rake in her back. An ambulance arrived on the scene as did some bystanders who knew the family. T.M. went back to the family farm with one of the bystanders. Todd went with another bystander and followed the ambulance to the hospital.

At the hospital, Amy was pronounced dead. A medical examiner completed an initial examination of her remains and discovered six puncture wounds on her back. The medical examiner also observed injuries to Amy's chin, cheek bone, knees, and knuckles of each hand. The injury to Amy's chin had both crush and scraping components to it, but there was no debris in the wound from hitting a

---

But he later clarified with the State and defense counsel that his estimate was inaccurate. He could not estimate how long Todd was out of his sight.

surface. Because Todd reported that Amy fell on the corn rake, the medical examiner asked to see it. When the examiner discovered the rake had four tines, he questioned how it could create six puncture wounds with one impact. So he contacted the state forensic pathologist and requested she perform an autopsy of Amy's remains.

Meanwhile, deputies followed T.M. back to the family farm where T.M. showed them the red shed and where he found Amy. That evening, Delaware County Deputy Sheriff Travis Hemesath was briefed on the case by Deputy Thomsen, who took Deputy Hemesath out to the family farm to investigate. Two days later, Deputy Hemesath attended the autopsy performed by the forensic pathologist.

The forensic pathologist determined the damage to Amy's left hand could be defensive wounds consistent with a struggle and that she had blunt force trauma to her chin, cheek, and ear. When examining the puncture wounds to Amy's back, the pathologist discovered two different wound paths. So the pathologist reasoned Amy was impaled with the corn rake at least two times and possibly three times. And the pathologist found the corn rake penetrated through Amy's back deep enough to rupture her breast implant and exit her front side, as well as puncture her lung and liver. So the pathologist classified Amy's manner of death as homicide.

As a part of his investigation, Deputy Hemesath executed a search warrant and took all of Todd's electronics, including a camera system with two cameras covering the property. No video from a camera pointed at the red shed could be recovered, and video from the camera pointed at the yard between the buildings

spanned September 11 through October 29 and then picked back up on November 11 through the day the camera system was confiscated. But investigators could not determine if the missing video was deleted. Deputy Hemesath also collected Todd's iPad that was located in his tractor at the time. Deputy Hemesath discovered that earlier in the year the Google account Todd used on his iPad was used to search for things like "did ancient cultures kill adulterers"; "thrill of the kill"; "thrill of the hunt"; "famous quote no thrill like that of hunting man"; "once you hunt man you will always feel the thirst"; "what happens to cheaters in history"; "killing unfaithful women"; "what to do with large open chest wounds"; and "organs in the body."[4]

Following the autopsy, Deputy Hemesath contacted Jon Turbett, a special agent with the Iowa Division of Criminal Investigations to assist in his investigation. Special Agent Turbett investigated Frasher, with whom Amy had had the affair, and eliminated him as a suspect. Special Agent Turbett also eliminated Frasher's wife as a suspect. Special Agent Turbett then interviewed Todd. Todd described his marriage to Amy as great and said that they had "a very healthy marriage." Eventually, Special Agent Turbett confronted Todd and accused him of killing Amy. Todd responded by asking what evidence he had and asked Turbett to tell him what the police knew. He told Special Agent Turbett, "You want me to confess to something I didn't do." During the interview, Todd was unemotional and "very flat."

---

[4] We acknowledge other family members had access to Todd's iPad and knew the password. But a rational jury could find Todd was the one who performed these searches.

Eventually Todd was arrested for Amy's murder, and the matter proceeded to a jury trial. Todd moved for judgment of acquittal following the State's presentation of evidence contending the State failed to present evidence Todd committed the act that killed Amy. Todd testified in his own defense. During cross-examination, Todd conceded that Amy's death was not an accident and someone stabbed Amy in the back with the corn rake two to three times. Todd renewed his motion for judgment of acquittal following his presentation of evidence. The jury convicted Todd of first-degree murder. Todd motioned for new trial, which the district court denied.

Todd appeals claiming the district court erred when it denied his motions for judgment of acquittal and abused its discretion in denying his motion for new trial because his conviction was not supported by sufficient evidence. Additional facts will be discussed as necessary.

## II. Scope and Standard of Review

"The principles governing our review of a district court's denial of a criminal defendant's motion for judgment of acquittal are well-established." *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). "A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law." *Id.* Guilty verdicts must be supported by substantial evidence, which is "that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Id.* (citation omitted). Though we consider all evidence, we view it in the light most favorable to the State. *Id.* So "[e]vidence is not insubstantial merely because we may draw different conclusions from it." *State*

*v. Lacey*, ___ N.W.2d ___, ___, 2021 WL 6138941, at *4 (Iowa 2021) (citation omitted).

When reviewing rulings on motions for new trial, we recognize "[t]rial courts have wide discretion in deciding motions for new trial." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). "Iowa Rule of Criminal Procedure 2.24(2)(b)(6) permits a district court to grant a motion for new trial when a verdict is contrary to the weight of the evidence." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "The weight-of-the-evidence standard requires the district court to consider whether more 'credible evidence' supports the verdict rendered than supports the alternative verdict." *Id.* (citation omitted). The question is "whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Id.* (citation omitted). And we review the district court's determination for an abuse of discretion. *Id.*

*A. Motions for Judgment of Acquittal*

We first address Todd's contention that the district court erred in denying his motions for judgment of acquittal because the State failed to present sufficient evidence to support his conviction. Todd generally attempts to poke holes in the State's case and essentially attempts to retry the case for a different audience on appeal. But those efforts are futile. It is not for us to independently weigh the evidence to reach our own conclusion as to Todd's guilt. Instead, we proceed by viewing the evidence in the light most favorable to the State to determine whether it presented substantial evidence of Todd's guilt—evidence that a jury could rely on to find Todd guilty beyond a reasonable doubt. *See Serrato*, 787 N.W.2d at 465.

In doing so, we break down the offense, murder in the first degree, element by element. "Where, as here, the jury was instructed without objection, the jury instructions are the law of the case for the purposes of reviewing the sufficiency of the evidence." *Lacey*, ___ N.W.2d at ___, 2021 WL 6138941, at 6. The marshalling instruction provided:

> The State must prove all of the following elements of murder in the first degree:
> 1. On or about the 10th day of November, 2018, the defendant committed an act upon Amy Mullis.
> 2. Amy Mullis died as a result of the act of the defendant.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Amy Mullis.

On appeal, Todd attempts to challenge sufficiency of elements one, two, and four of the marshalling instruction.[5] But the State contends Todd only adequately preserved error as to the first element—identity. "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). So we must first consider whether Todd adequately identified specific grounds related to each of the challenged elements in his motion for judgment of acquittal before we may consider them on appeal.

With respect to the first element, we agree with the State that Todd adequately challenged identity to preserve a challenge to the first element. With respect to the second element, Todd now claims Amy died as the result of a tragic

---

[5] Todd acknowledges element three, that he acted with malice aforethought, is a necessary element of the offense. But he does not specifically challenge the sufficiency of the evidence with respect to that element.

accident, not as the result of another person's actions. But Todd never argued this ground when making his motion. Instead, Todd's counsel conceded Amy "died obviously as a result of criminal behavior."[6] So his challenge to the second element is not preserved. With respect to the fourth element, which requires evidence Todd acted "willfully, deliberately, premeditatedly, and with the specific intent to kill Amy," we do not think Todd's motion raised an adequate challenge to preserve the issue for appeal.[7] And the "obvious and understood" exception to our error preservation rule does not apply. *See State v. Williams*, 695 N.W.2d 23, 27(Iowa 2005) (concluding grounds of a motion for judgment of acquittal are "obvious and understood" by counsel and the trial judge if the record shows only one element posed the fighting issue). Accordingly, we limit our review to determine whether there is sufficient evidence that Todd was Amy's assailant.

---

[6] Todd claims he never authorized his counsel to make such a concession, seemingly assuming this will permit him to argue Amy died as the result of an accident on appeal. Even if that were true, Todd himself conceded on cross-examination that someone killed Amy, and the evidence presented at trial established Amy died as the result of intentional conduct not a tragic accident. Moreover, she had defensive wounds on her hand, her chin injury (absent of any debris) was consistent with being stuck by someone as opposed to falling into something, and the corn rake punctured her back at least two times. This evidence is indicative of an attack perpetrated by one person on another not merely an unsteady person falling into a sharp object and fatally injuring themselves.

[7] Even if Todd had preserved this issue for appeal, we would conclude the State presented sufficient evidence of this element. The internet searches on Todd's iPad show was planning to murder Amy. Todd was aware of her affair and did not want to lose his farm in a divorce. The evidence established Todd impaled Amy at least two times with the corn rake, went back to work in the hog barn, and left Amy to die in the red shed. From this the jury could determine Todd's conduct was intentional and not accidental, making his conduct willful. And Todd impaled Amy multiple times, necessarily giving him a moment in between blows to consider his actions and resolve himself to strike again. So the evidence is sufficient to support a finding Todd acted deliberately, with premeditation, and specific intent to kill. *See State v. Thomas*, No. 19-0379, 2020 WL 5651563, at *4 (Iowa Ct. App. Sept. 23, 2020).

Reviewing the evidence in the light most favorable to the State, we conclude there was sufficient evidence to identify Todd as Amy's attacker. Though not a required element to the offense, we recognize Todd had motive to kill Amy. Witnesses testified that Amy was getting up the nerve to leave Todd, but Todd was staunchly against divorce because it would put his cherished farming operation at risk. The State also presented evidence that Amy, T.M., and a family friend believed Todd would kill Amy if he learned of her affair. And rumors were running through the community. Todd admitted he was suspicious of the affair even after he confronted Frasher about it. The jury could have reasonably concluded that Todd learned of the affair, Amy's plans to leave him, or both and resolved to kill her either in an act of vengeance or as an attempt to avoid divorce and preserve his assets. From the evidence presented, it was clear that either would serve as strong motivation for Todd to act.

Getting down to brass tacks, only Todd and T.M. knew Amy would be in the red shed when she went to move the pet carrier. T.M. never left the hog barn; but he did lose sight of Todd while they worked. And T.M. could not say how long Todd was out of his sight. The two youngest children were inside the home the entire time. Both T.M. and Todd testified that no one else was on the farm that day. And Todd never heard anyone drive onto their rural property. So there are no other potential assailants.

Todd argues it would be impossible for him to run fifty-plus yards inside the hog barn, exit a double-latch door on the east end of the barn, sprint one-hundred-fifty yards to the red shed, murder Amy with a corn rake, and run back in the time it took T.M. to get a drink. But Todd's argument rests on a faulty premise because

T.M. could not say how long Todd was out of his sight. This provided a window of opportunity for Todd to slip out of the barn while T.M. worked. Todd relies strongly on T.M.'s testimony that Todd did not appear winded or upset when he saw him again. Here, young T.M. was just in eighth grade when he testified at trial almost a year after the events in question. Given his young age and the trauma he no doubt experienced as result of this incident, no one would expect him to remember the day with perfect recall. And juries are free to weigh the credibility of witnesses and believe some, all, or none of a witness's testimony. *See State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014) ("In our system of justice, it is the jury's function to determine the credibility of a witness."). So T.M.'s testimony about Todd not appearing winded or upset is not dispositive.

What is clear from the evidence is that only T.M. and Todd knew where to find Amy when she was attacked, Todd had ample motive to harm her, T.M. never left the hog barn, and he lost sight of Todd while they worked. Other than the younger children, there is no evidence anyone else was on the farm that fateful day. From the evidence presented, Todd is the only possible assailant. So we conclude the State presented sufficient evidence that Todd was Amy's attacker and the district court properly denied the motions for judgment of acquittal.[8]

---

[8] We note Todd takes issue with the State's reference to a recording of the 911 call Todd made. The State claimed Todd could be heard whispering "cheating whore" and "go to hell, cheating whore" as he performed CPR on Amy. Todd denied making these statements during cross-examination. So he claims without evidence to contradict his testimony, we should disregard the State's arguments as it relates to the 911 call. But the recording of the call was admitted into the record, so the recording itself serves as contradicting evidence. It is clear from the recording Todd mutters something under his breath as he performs CPR on Amy. And while it is barely audible, it is consistent with Todd calling Amy a "cheating whore" and telling her to "go to hell, cheating whore." The recording of the 911 call

*B. Motion for New Trial*

Todd also claims because there is insufficient evidence to support his conviction, then the district court necessarily abused its discretion in weighing the evidence and determining the weight of the evidence supported the conviction. From the get go, we disagree. As previously discussed, there was sufficient evidence supporting Todd's conviction. When ruling on the motion for new trial from the bench, the district court stated,

> I would say I think that I'm actually required or at least that I should independently weigh the evidence and consider credibility as it pertains to a motion for new trial. If the verdict is contrary to the weight of the evidence, the defendant is entitled to a new trial. I cannot say that the evidence in this case or that the verdict is contrary to the weight of the evidence.

So the court applied the correct standard and independently weighed the evidence. And from our review of the evidence, we believe it was not impossible for Todd to commit the crime as he claims. Rather, we find the greater weight of the credible evidence establishes Todd was vengeful over Amy's infidelity. He researched how to kill his wife on the internet. He planned her murder to avoid losing his farm in a divorce. Todd took advantage of the opportunity when his weakened wife went to the shed where he stored a corn rake. Todd slipped out of the barn, assaulted Amy, impaled her at least twice with the corn rake, and returned without being noticed by T.M. who was busy cleaning ceiling lights. Later Todd sent T.M. to find Amy. We conclude the credible evidence weighs in favor of Mullis's guilt. The verdict rendered was not a miscarriage of justice. *See Ary*, 877 N.W.2d at 706.

---

was in evidence. The jury could listen for themselves and believe or disbelieve what the prosecutor represented to be on the recording. But even without consideration of this evidence, there is sufficient evidence to convict Todd.

The district court did not abuse its discretion in determining the greater weight of the credible evidence supported the jury's verdict finding Todd guilty of murder in the first degree and denying the motion for new trial.

**III. Conclusion**

The State presented sufficient evidence identifying Todd as Amy's attacker. So the court correctly denied Todd's motions for judgment of acquittal. And the court did not abuse its discretion in denying Todd's motion for new trial.

**AFFIRMED.**