# IN THE COURT OF APPEALS OF IOWA

No. 16-2110
Filed February 21, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DAVID CHARLES MILLER,**
        Defendant-Appellant.
_____


Appeal from the Iowa District Court for Benton County, Ian K. Thornhill, Judge.


A defendant challenges his convictions and sentence for one count of voluntary manslaughter and two counts of second-degree theft. **JUDGMENT AFFIRMED, SENTENCE VACATED, AND REMANDED FOR FURTHER PROCEEDINGS AND RESENTENCING.**


Mark C. Smith, State Appellate Defender, and Robert P. Ranschau, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sheryl A. Soich, Assistant Attorney General, for appellee.


Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

The jury heard evidence David Miller killed his live-in girlfriend and, after leaving the bloody crime scene, totaled two stolen pickup trucks. Following deliberation, the jury returned guilty verdicts of voluntary manslaughter and two counts of second-degree theft. The district court enhanced the theft offenses based on Miller's habitual-offender status and sentenced him to consecutive terms totaling forty years. Miller appeals his convictions and prison sentence, alleging ineffective assistance of counsel, insufficient evidence, improper enhancement procedures, and sentencing errors.

Because defense counsel may have had a strategic reason for not moving for judgment of acquittal on the homicide count, we preserve that claim for possible postconviction proceedings. We find substantial evidence to support the two theft convictions. As for the habitual-offender enhancement, vacation of the sentence is required. Because we remand for further proceedings consistent with the interpretation of Iowa Rule of Criminal Procedure 2.19(9) in *State v. Harrington*, 893 N.W.2d 36 (Iowa 2017), we need not reach the sentencing issues.[1]

## I. Facts and Prior Proceedings

On a chilly morning in late October, a passersby noticed a man—later identified as Miller—walking barefoot along the shoulder of Lewis Bottoms Road near Palo wearing only his boxer shorts. Dispatched to the location around 11:30 a.m., state troopers detained Miller while they tried to figure out what was going on. The troopers noticed Miller had "scratches and blood all over him," as well as

---

[1] For purposes of Miller's resentencing, if the district court imposes the habitual-offender sentences under Iowa Code section 902.9(1)(c) (2015), the $750 fines are not authorized.

large gashes on his head and right hand. Miller gave troopers the implausible explanation that he had been out with friends "playing a game of war" and had to strip when the others placed "smoke bombs" around his waist and in his pockets. Emergency services transported Miller to the hospital.

Contemporaneous with Miller's detention, dispatch received a report that neighbors found the body of Sabrina Hustad Janish,[2] outside the rural Vinton residence she shared with Miller. Benton County authorities were already investigating two reports of stolen pickup trucks that morning.

One of the trucks was taken from the driveway of Justin Varner, who lived in the same rural neighborhood as Miller. Varner woke to the "rumble" of his 1977 Chevy Silverado around 3:45 a.m. Varner raced outside but could not stop the man—whom he did not know at the time, but identified at trial as Miller—from driving off in the Silverado. Varner recalled Miller wearing a "hoodie" and staring at him with a "deer-in-the-headlights look." That look led Varner to believe Miller was under the influence of methamphetamine. Varner recalled Miller saying "something along the lines of his dad told him to either take the truck or told him to get the truck." Varner notified police who found the pickup on the "next gravel road over" that had been closed for construction. The pickup was a total loss after being "smashed into the front of a large crane."

After his Silverado was recovered—the driver's door smeared with blood—Varner and some neighbors spied a blood trail from his driveway to the next lot up the street where Miller lived. The trail ended at the body of a woman, clad in

---

[2] The parties generally refer to the victim as Sabrina Hustad, so we will do the same in this opinion.

pajamas, lying face down on the grass outside Miller's trailer home. One of the neighbors touched her shoulder and said "she's cold, you better call 911." The deceased woman was later identified as twenty-six-year-old Hustad, who moved into the residence with Miller just ten days earlier. Agents with the Iowa Division of Criminal Investigation (DCI) told Miller a woman's body had been discovered outside his trailer. He responded that he didn't know anything about it or who it was.[3]

The second pickup, a white 2001 Ford F-150, was taken sometime before 9 a.m. from outside of Brian Brummer's machine shed. Brummer lived about an eighth of a mile from where the Silverado smashed into the construction crane. Later that morning, state troopers flying a plane over the Pleasant Creek State Recreation Area near Palo spotted Brummer's F-150 mired in the mud in a heavily wooded area. On the ground, officers discovered the truck had slid off the road bed and collided with several trees, ripping off the front bumper. The driver's side airbag had deployed, and the interior was covered with "quite a bit of blood." In the nearby lake bed, officers found a hooded sweatshirt and two boots, as well as prints left by the barefooted Miller.

State Criminalist Brenda Crosby examined these mud-caked exhibits. Crosby detected blood on the sweatshirt but could not develop a DNA sample because bacteria in the mud inhibited the process. Crosby found blood stains on the boots that tested positive for DNA from two individuals, but she could only

---

[3] Miller told the DCI agents during an hour-long interview at the hospital that he had been using methamphetamine the night before he was detained by the state troopers. Miller also stuck to his story that he received his injuries during some bizarre war game.

develop the profile matching Miller as the major contributor. The criminalist also performed a Hematrace blood screening test that revealed Hustad's blood on the lace from the right boot. In more lab analysis, Crosby tested swabs of blood taken from the driver's side door of the Silverado, which matched Miller's DNA profile. Crosby also detected Miller's DNA in blood droplets retrieved from Hustad's pajama pants and her bare foot.

Investigators found more blood evidence, as well as signs of a struggle, inside the residence shared by Miller and Hustad. A lamp and end table were overturned; cigarettes and beer cans were scattered around the living room. Most significantly, a buck knife was left in a pool of blood on the carpet. Crosby confirmed Hustad's blood was on the knife.[4]

An autopsy performed on Hustad revealed two-dozen measurable stab wounds and many more scratches. Hustad had defensive wounds on her hands, indicating she tried to grab the knife during the struggle. Associate Medical Examiner Michele Catellier determined Hustad also had been strangled, based on bruising and petechial hemorrhages on the vicitm's neck. Dr. Catellier declared the cause of death as "multiple stab wounds with strangulation."

---

[4] In closing argument, the prosecutor summarized the State's theory of the case:

> You could reasonably conclude from this evidence that Sabrina never gets to her feet while this attack is happening, but [Miller] does and [Miller] has the ability to walk around and take off from the scene. . . . [Miller] takes Varner's truck, without his permission and wrecks it, wrecks it fairly close to where he takes it from. He then proceeds on foot, . . . takes the Brummer vehicle and then wrecks it at Pleasant Creek State Recreational Area. . . . At this point, [Miller] has exhausted his vehicle options and he's on foot. And he's in his underwear, . . . and he's still attempting to get away.

The State charged Miller with murder in the first degree and two counts of theft in the second degree while being an habitual offender. His jury trial took place in September 2016. The jury returned guilty verdicts on the second-degree theft counts. But the jury acquitted the defendant of murder, instead finding him guilty of the lesser-included offense of voluntary manslaughter. The district court discussed the habitual offender allegations with Miller, and Miller stipulated to having at least two qualifying felony convictions. The court sentenced Miller to consecutive terms of fifteen years on the two enhanced theft offenses and ten years on the voluntary manslaughter count, for a total sentence not to exceed forty years. Miller appeals his convictions and sentence.

## II. Scope and Standards of Review

Because of its constitutional basis, we review Miller's claim of ineffective assistance of counsel de novo. *See State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). We review his substantial-evidence challenge for correction of legal error. *See* Iowa R. App. P. 6.907; *see also State v. Rohm*, 609 N.W.2d 504, 509 (Iowa 2000). As for his objection to the enhancement proceeding, we again review for correction of legal error; but if the argument implicates constitutional rights, we engage in a de novo review. *See Harrington*, 893 N.W.2d at 41.

## III. Analysis

### A. Ineffective Assistance of Counsel—Homicide Count

Miller contends he was denied effective assistance of counsel because his trial attorney did not move for judgment of acquittal on count I, the homicide offense, and did not ask for a new trial on the voluntary manslaughter verdict.

After the close of the State's case in chief, defense counsel told the court:

> Your Honor, we are aware, obviously, of the ability to file or to ask for a motion for judgment of acquittal at the close of the State's evidence. The real question is vague as to whether or not there's enough there to make that motion. As it relates to Count 1, we are not making that motion, and I have discussed it otherwise with my client and he understands that.

On appeal, Miller contends counsel was constitutionally remiss in not moving for judgment of acquittal because the State did not offer substantial evidence to prove voluntary manslaughter.[5] Specifically, Miller argues the State did not present evidence that Hustad's death by strangulation or stabbing "was preceded by any provocation." In addition, Miller contends counsel was remiss in limiting his motion for new trial to the theft counts, rather than also alleging the voluntary-manslaughter verdict was against the greater weight of the evidence.

The defense may move for judgment of acquittal as a means to challenge the sufficiency of the evidence before the district court submits a criminal case to the jury. *See* Iowa R. Crim. P. 2.19(8)(a); *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). "A guilty verdict must be supported by substantial evidence." *Serrato*, 787 N.W.2d at 465. Substantial evidence is defined as the quantity and quality of proof from which a rational trier of fact could find the accused guilty beyond a reasonable doubt. *See id.* After the jury has returned a guilty

---

[5] Iowa Code section 707.4 provides:

> A person commits voluntary manslaughter when that person causes the death of another person, under circumstances which would otherwise be murder, if he or she acts solely as the result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill. Voluntary manslaughter is an included offense under an indictment for murder in the first or second degree. Voluntary manslaughter is a class "C" felony.

verdict, the defense may move for a new trial on the ground that "the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6). "A verdict is contrary to evidence when it is against the [greater] weight of the evidence" presented at trial. *State v. Taylor*, 689 N.W.2d 116, 133–34 (Iowa 2004) (citing *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998)).

To prevail on his ineffective-assistance claim, Miller must show both that (1) counsel failed to perform an essential duty and (2) prejudice resulted from the omission. *See State v. Fountain*, 786 N.W.2d 260, 265–66 (Iowa 2010). The test is whether counsel's performance fell below an objective standard of reasonableness to the extent that the Sixth Amendment's guarantee was not fulfilled. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Our scrutiny of counsel's performance is "highly deferential," and we indulge in a strong presumption counsel has acted in a professional manner. *See id.* at 689. Defendants are not entitled to perfect representation, only that which is within the range of normal competency. *State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). "Improvident trial strategy, miscalculated tactics, or mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *Osborn v. State*, 573 N.W.2d 917, 922 (Iowa 1998). We often reserve claims of ineffective assistance for postconviction-relief proceedings, in part, so counsel may have his "day in court" as his reputation is being impugned. *See State v. Stewart*, 691 N.W.2d 747, 750 (Iowa Ct. App. 2004) (quoting *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978)).

In this case, defense counsel did not misunderstand or overlook the opportunity to seek judgment of acquittal on the homicide offense. Rather, he consulted with his client and decided against it. Similarly, counsel targeted the

theft counts in the motion for new trial and declined to attack the voluntary-manslaughter verdict.

On appeal, the State contends defense counsel should be permitted to explain his strategic choices in postconviction proceedings. We agree the record is inadequate to address these claims on direct appeal and preserve the ineffective-assistance complaints for further development should Miller seek postconviction relief.

### B. Substantial Evidence—Vehicle Theft

Miller next claims the district court should have granted his motion for judgment of acquittal on the second-degree theft counts. For those offenses, the State was required to prove, beyond a reasonable doubt, the following elements: (1) Miller knowingly took possession or control of a motor vehicle; (2) at the time of the taking, the motor vehicle belonged to another person; (3) Miller took possession or control with the specific intent to permanently deprive the other person of the vehicle. Iowa Code §§ 714.1(1), 714.2(2).

As defense counsel argued in making his motion for judgment of acquittal, "the fighting issue is the intent to permanently deprive." Counsel asserted Miller's taking of the pickup trucks could be best described as an "erratic exodus from his home" and the State did not offer evidence indicating Miller "wanted to keep the vehicles for himself."[6] The prosecutor articulated a counterpoint: Miller's intent

---

[6] Contrary to defense counsel's assertion, the State was not required to prove Miller sought a pecuniary advantage from taking the trucks. The requisite intent is stated in terms of "the owner's deprivation rather than of the thief's gain." *See* 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.5 (3d ed. 2017) [hereinafter LaFave].

"was to use those vehicles like commodities . . . he was not concerned about returning them in nice shape to the owners." Indeed, both vehicles were totaled after Miller crashed them into a construction crane and a grove of trees, respectively.

To support his substantial evidence argument on appeal, Miller relies on *State v. Schminkey*, 597 N.W.2d 785, 787 (Iowa 1999) and *State v. Morris*, 677 N.W.2d 787, 788 (Iowa 2004). In *Schimkey*, our supreme court contrasted the mens rea element for theft by taking in section 714.1(1) ("the intent to deprive"[7]) with the definition of operating without the owner's consent in section 714.7 ("without the intent to permanently deprive the owner thereof") and held "the intent to *permanently* deprive the owner of his property" is an essential element of theft by taking. 597 N.W.2d at 789. The *Schmikey* court vacated a guilty plea for vehicle theft because the record did not support a factual basis for the defendant's intent to permanently deprive.[8] Schminkey had been drinking heavily, took a truck owned by a man he did not know, drove erratically, soon crashed the truck, and killed another driver before colliding with a fence. *Id.* at 787. The *Schminkey* court opined none of those facts indicated the defendant "intended to do anything more

---

[7] The definition of theft in Iowa Code section 714.1 is based on the Model Penal Code. *State v. Donaldson*, 663 N.W.2d 882, 885 (Iowa 2003). The Model Penal Code defines "deprive" in two ways: "(a) to withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value, . . . ; or (b) to dispose of the property so as to make it unlikely that the owner will recover it." Model Penal Code § 223.0(1) (Am. Law Inst. 1962).

[8] Iowa is among "a large number of states [that] have singled out the motor vehicle for special treatment, making it a crime (generally called 'joyriding,' a crime somewhat less serious than larceny) to take such a vehicle with intent to use it and return it." *See* LaFave, at § 19.5(b).

than temporarily use the vehicle to go home or to another bar." *Id.* at 791. "Because Schminkey wrecked the pickup before he could dispose of it, we do not have the typical inferences that can be drawn from a defendant's actions subsequent to the taking." *Id.* The court held Schminkey's admitted taking was insufficient, standing alone, to support an inference that he intended to permanently deprive the owner of the truck. *Id.* at 791–92 (emphasizing plea record contained "no admissions by the defendant or statements from other witnesses that would indicate Schminkey's purpose in taking the vehicle").

The supreme court reaffirmed *Schminkey* in *Morris*. Morris took a truck that had been warming up in front of the owner's house. 677 N.W.2d at 787. Within half an hour of the owner reporting the truck missing, police stopped Morris behind the wheel about five miles away; he fled on foot. *Id.* at 788. The State argued Morris's evasive action signaled his intent to permanently deprive. *Id.* The supreme court disagreed, reasoning: "Abandoning the vehicle and fleeing upon observing the presence of police was an act that would ordinarily assure that the truck would be returned to its owner." *Id.* The *Morris* court further explained:

> Although apprehension of the suspect within a short time of the taking of the vehicle does not defeat the possibility that there was an intent to permanently deprive the owner of the property at the time of the taking, it is a circumstance that severely limits the circumstantial evidence from which that intent can be inferred.

*Id.*

Our task is to decide if substantial evidence buoys the jury's verdicts finding Miller guilty of two counts of second-degree theft. We consider all the evidence, not just that supporting the verdicts, and view such evidence in the light most favorable to the State. *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017). As framed

in *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012), the question is whether the State offered sufficient proof from which a reasonable jury could conclude Miller "took the [trucks] for more than a joyride."

Proof that Miller acted with the specific purpose of permanently depriving Varner and Brummer of their trucks requires us to decipher what Miller was thinking at the time of the takings. *See Schminkey*, 597 N.W.2d at 789. What someone is thinking can seldom be established with direct evidence. *State v. Fratzke*, 446 N.W.2d 781, 783 (Iowa 1989). "Therefore, the facts and circumstances surrounding the act, as well as any reasonable inferences to be drawn from those facts and circumstances, may be relied upon to ascertain the defendant's intent." *Schminkey*, 597 N.W.2d at 789. Accordingly, we examine the record for facts and circumstances that would support an inference Miller intended to permanently deprive Varner and Brummer of their trucks.

Several circumstances separate Miller's case from *Schminkey* and *Morris*. First, the jury could have inferred Miller's purpose at the time he took Varner's truck was to place distance between himself and his blood-soaked trailer where he had stabbed his girlfriend twenty-four times. The evidence showed Miller decided against taking his own pickup truck or his work van, both of which remained parked outside his trailer. The jury could have deduced that Miller wanted to take someone else's vehicle to avoid detection.

Second, unlike Schminkey and Morris who did not encounter the owners of the vehicles they operated, Miller took Varner's vehicle in the owner's physical presence and against his obvious wishes. When Varner was running down his driveway to stop the theft, Miller did not tell Varner, "Don't worry. I'll bring your truck

right back." Rather he gave Varner the odd excuse that Miller's father told him to take Varner's truck. The jury could have inferred from this exchange that Miller had no intent to return the truck.

Third, after Miller wrecked Varner's truck, he fled on foot and seized a second getaway vehicle. Miller drove Brummer's truck off the road into a thicket of trees at a remote recreation area. The sequential nature of Miller's thefts and acts of vandalism distinguishes this case from *Schminkey* and *Morris*. The jury could infer Miller had no bona fide intent to return the trucks to their owners—but rather expected to use them in whatever manner possible to avoid apprehension for killing his girlfriend.

Fourth, while being detained along Lewis Bottoms Road, Miller was confronted by a state trooper, "we have a pretty good idea you stole and wrecked two vehicles." Miller cursed a denial and insisted he had not been driving. The jury could have found Miller's failure to reveal the location of the trucks was inconsistent with a true intent that they be restored to their owners.

Miller argues the evidence did not show his intent to permanently deprive because he "took the vehicles in an attempt to remove himself from the area." But taking someone else's truck as a getaway vehicle is not the equivalent of a joyride—where the only plan is to take a quick excursion and then return the vehicle. Even assuming Miller actually intended to use Varner's truck and then Brummer's truck "'only temporarily' (as he would need [them] to achieve a successful flight from the authorities)" we are not convinced his theory negates, as a matter of law, his specific intent to permanently deprive the owners of their property. *See State v. Gordon*, 321 A.2d 352, 357 (Me. 1974) (explaining lack of

contradiction between a thief's temporary use of stolen property and the owner's permanent deprivation).

A leading commentator has described actions like those taken by Miller as evincing the intent to permanently deprive; "if one takes another's property intending to use it recklessly and then abandon it, the obstacles to its safe return to the owner are such that the taker possesses the required intent to steal." *See* LaFave, at § 19.5(b) (citing *State v. Davis*, 38 N.J.L. 176 (N.J. 1875); *Regina v. Holloway*, 169 Eng. Rep. 285 (1848) ("intent to use another's goods 'in a reckless, wanton, or injurious manner, and then to leave it to mere chance whether the owner ever recovered them or no, and if he recovered them at all would probably recover them in a damaged or altered condition' is an intent to deprive the owner wholly of his property, which describes the mental state required for larceny")).

*Schminkey* draws a distinction between accidental and intentional damage to property taken without permission. 597 N.W.2d at 791–92 (summarizing *Slay v. State*, 241 So. 2d 362, 364 (Miss. 1970) as "holding evidence insufficient to prove intent to permanently deprive where eighteen-year-old driver did not purposefully wreck car taken from used car lot" and summarizing *State v. Winkelmann*, 761 S.W.2d 702, 708 (Mo. Ct. App. 1988) as "finding sufficient evidence of an intent to permanently deprive where defendant intentionally drove car into a brick wall, inflicting severe damage"). But in Miller's case, the jurors could have accepted either inference. The jurors could have believed Miller—high on drugs—accidentally totaled both trucks before he had a chance to restore them to their rightful owners. But the jurors instead, as they were entitled to do, adopted the State's theory that Miller had no intent to return the trucks in operable condition

and either recklessly or deliberately damaged them to throw the authorities off his trail. *See Gordon*, 321 A.2d at 358–59 (deciding jury was warranted in concluding defendant had intent to permanently deprive as he was "indifferent" to whether the owner would ever see his car again and would "abandon it in whatever manner might happen to meet the circumstantial exigencies of defendant's predicament—without . . . any thought that the relinquishment of the possession was to be in a manner having some affirmative tendency to help in the owner's recovery of his property").

In this case, Miller disposed of the pickup trucks in a manner that made it unlikely their owners would recover them with any remaining economic value. The district court appropriately let the question of Miller's intent to permanently deprive be decided by the jury. We will not disturb the guilty verdicts on the two counts of second-degree theft.

### C. District Court Colloquy—Habitual Offender Enhancement

Miller submits the district court erred in accepting his stipulation to prior felony offenses for purposes of the habitual offender enhancement without complying with Iowa Rule of Criminal Procedure 2.19(9). Our supreme court recently spelled out the necessary elements of the habitual offender colloquy. *Harrington*, 893 N.W.2d at 45 (requiring district courts to ensure admission to prior offenses is voluntary and intelligent, and defendant understands ramifications of habitual-offender adjudication); *see also State v. Kukowski*, 704 N.W.2d 687, 691–94 (Iowa 2005).

Persons convicted of class "C" or "D" felonies are subject to sentencing enhancements if they have been twice before been convicted of any felony. Iowa

Code § 902.8. The habitual-offender sentence is an indeterminate fifteen years with a minimum term of three years before parole eligibility. *Id.* § 902.8, 902.9(1)(c). After being convicted, an offender has the chance in open court to affirm or deny he or she is the same person who was previously convicted. Iowa R. Crim. P. 2.19(9). If an offender denies being the person previously convicted, he or she is entitled to a jury trial on the identity issue. *Id.* If the offender admits to being the person previously convicted, the habitual-offender sentencing proceeds. *See id.*

Under *Harrington*, the district court must engage the offender in a colloquy before accepting his or her admission to being the person who committed the previous felonies. 893 N.W.2d at 45. The district court must inform the offender of five things: (1) the nature of the habitual-offender charge, including the fact that the prior felony convictions are only valid enhancers if the offender was represented by counsel or knowing and voluntarily waived counsel before being convicted of the previous felonies; (2) the maximum possible punishment, including the mandatory minimum punishment; (3) the trial rights listed in Iowa Rule of Criminal Procedure 2.8(2)(b)(4) the offender is waiving; (4) that no trial will take place if the offender admits the prior convictions; and (5) that challenges to an admission based on defects in the habitual-offender proceedings must be raised in a motion in arrest of judgment. *Id.* at 45–46.

In Miller's case, after the jury returned its verdicts, the parties conferred with the district court about the habitual-offender enhancements. The court asked if the defense was "prepared to address the habitual offender nature" of the two theft convictions. Defense counsel said Miller would not be seeking a jury trial on the

qualifying offenses. Counsel further asserted Miller would "concede he has two prior felonies, so all the elements, the State will have to prove nothing." The court then addressed Miller personally, advising him of the habitual-offender penalties and that he could ask for a jury to hear the facts of his previous felony convictions. Miller said he was not disputing his felony record. The court ensured Miller understood he could "put [the State] through those paces" if he chose to require documentation of the prior felony convictions.

The district court did not inform Miller that for the prior convictions to qualify under rule 2.19(9) they must have been entered with the assistance of counsel or followed a valid waiver of counsel. The court also did not fully inform Miller of the trial rights he was giving up by stipulating. *See* Iowa R. Crim. P. 2.8(2)(b)(4)–(5). The record of the stipulation also did not establish a factual basis for the habitual-offender adjudication. *See Harrington*, 893 N.W.2d at 45–46. Accordingly, the court's colloquy with Miller did not substantially comply with the *Harrington* mandates.

The State agrees the colloquy was deficient but contests error preservation and the retroactive application of *Harrington*. The State also argues Miller cannot show he was prejudiced by the faulty habitual-offender colloquy because the minutes of evidence set forth the details of his prior felony convictions and Miller has not challenged his identity as the person previously convicted or that the convictions were obtained in violation of his right to counsel.

*Harrington* held offenders in a habitual offender proceeding "must preserve error in any deficiencies in the proceeding by filing a motion in arrest of judgment." 893 N.W.2d at 43. But the court decided the error-preservation rule would apply

prospectively. *See id.* Miller did not file a motion in arrest of judgment, but his colloquy predated *Harrington.*[9] He was thus excused from the necessity of filing a motion in arrest of judgment to preserve error on this issue. *See State v. Steiger*, 903 N.W.2d 169, 170 (Iowa 2017) (reversing for failure to comply with colloquy despite no motion in arrest of judgment because *Harrington's* error-preservation rule was not established at time of colloquy).

As for the State's retroactivity argument, we have decided *Harrington's* colloquy requirements shall be applied to all non-final cases pending in district court or on direct appeal at the time that decision was issued. *See State v. Allie*, No. 17-0190, 2018 WL 739297, at *5 (Iowa Ct. App. Feb. 7, 2018). We also reject the State's prejudice argument. The question before us is not whether Miller "suffered no prejudice because evidence existed to establish the prior convictions, but whether [he] knowingly and voluntarily admitted the prior convictions." *See Harrington*, 893 N.W.2d at 43 n.2.

The proper remedy in this case is to vacate Miller's sentence and remand for further proceedings consistent with this decision. *See State v. Coleman*, ___ N.W.2d ___, ___, 2018 WL 672132, at *16 (Iowa 2018) (vacating sentence that included the enhancements and remanding for further proceedings consistent with *Harrington* and for resentencing).

**JUDGMENT AFFIRMED, SENTENCE VACATED, AND REMANDED FOR FURTHER PROCEEDINGS AND RESENTENCING.**

---

[9] *Harrington* was decided on April 7, 2017. The district court engaged in the habitual-offender colloquy with Miller on September 21, 2016.