# IN THE COURT OF APPEALS OF IOWA

No. 22-1497
Filed June 5, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATHURIN PETTIT,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, David M. Cox, Judge.

A defendant appeals his convictions for sexual abuse in the third degree.

**AFFIRMED.**

Ryan J. Mitchell of Orsborn, Mitchell & Goedken, P.C., Ottumwa, for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Considered by Ahlers, P.J., Buller, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GAMBLE, Senior Judge.**

Mathurin Pettit appeals his convictions for third-degree sexual abuse. We find sufficient evidence supports the convictions, and the district court did not abuse its discretion in denying Pettit's motion for mistrial. We affirm.

### I. Background Facts & Proceedings

In 2021, the State charged Pettit with five counts of sexual abuse in the third degree, in violation of Iowa Code sections 709.1, 709.4(1)(a) (2019). The conduct was alleged to have occurred in the second half of 2019. At the jury trial in September 2021, the jury heard the following evidence.

In 2019, A.M. was fifteen years old, and her family of six moved from Florida to Iowa. Pettit was friends with A.M.'s stepfather and allowed the family to stay in his two-bedroom apartment with him and his two children. Pettit slept in one bedroom with his son; A.M. and the other four children slept in the second bedroom. Pettit and the stepfather worked together at a warehouse, leaving around 1:00 p.m. and returning at 6:00 a.m. A.M.'s mother worked from 6:00 p.m. to 6:00 a.m. A.M. referred to Pettit as an uncle—an honorific used in the A.M.'s culture for older, unrelated persons who are close and live around you.

A.M. testified the first time Pettit showed sexual interest towards her, she was the last one awake at night when Pettit came home and she let him in the apartment. She was wearing a nightgown but had no undergarments on underneath. Pettit pulled her hand and pushed her towards the wall. He put his hand under her nightgown and started rubbing her genital area while groping her

breast through her nightgown. A.M. said Pettit commented on her lack of underwear and she "could smell a slight liquor . . . like Fireball."[1]

A.M. testified another night she was again the last one awake and was in the kitchen, when she heard knocking on the door. She let Pettit inside, home from work early. She turned off the lights and headed towards her bedroom to go to bed, when Pettit pulled her back into the kitchen by her arm, pushed her into a kneeling position, unzipped his pants, and "shoved his genital—his penis into [her] mouth." Pettit kept one hand on her head and one on her shoulder, holding her in place until he ejaculated into her mouth. She remembered it was "very salty." She went to the bathroom off her bedroom "and I spit it out and I brushed my teeth," then went to bed.

A.M. also described a late night incident in Pettit and his son's bedroom when everyone else was asleep. A.M. was heading toward the bathroom, when Pettit called her into his room. He put pressure on her shoulders and told her to lay on the floor. Pettit put on a condom retrieved from a black backpack in the closet, and then pulled down A.M.'s sleep shorts and penetrated her vagina with his penis until he ejaculated. He kept his hand over her mouth. A.M. stated the act was not consensual, and she felt "irritation and burn." He then went to the main bathroom, and she returned to her bedroom to go to bed.

According to A.M., one afternoon she had walked home from school early, and Pettit was parked in a white van by the door on the back side of the building

---

[1] Fireball is a cinnamon-flavored whisky. A.M. explained she was familiar with Fireball's "cinnamon smell" from tasting it when friends were drinking. She was sure it was Fireball because "The cinnamon smell is the only thing I can remember."

near the garages.  Pettit called her over to get in the van and directed her to one of the benches in the back part.  Pettit pulled his pants down to his knees, put on a condom, slid down A.M.'s jeans and underwear, lay on top of her, and penetrated her.  After he ejaculated, he took off the condom, pulled up his pants, and disposed of the condom in a nearby garbage.  A.M. righted her clothes, got out of the van, and went inside.

A.M. also recalled a daytime incident in the apartment when she was home after school to change clothes before sports practice.  Pettit was out in his van about to leave, but instead followed her up to the empty apartment.  He interrupted her while changing, told her to lay on the floor again in the bedroom he shares with his son, got a condom from his sock drawer, and put it on.  He again sexually assaulted her, disposing of the condom in the toilet after he was done.

A.M. did not physically resist Pettit, saying she "would just lie down and just take it, even if it was uncomfortable. . . .  I felt it was better to submit."  She explained submission "gives you a better chance at surviving.  You never know when your attacker can become violent."  But she did not want him to touch her or penetrate her.  During her deposition, A.M. stated Pettit was circumcised.  She testified she thought it was circumcised because the tip of his penis was exposed during the oral sex incident.

A.M. did not tell her parents about the assaults, explaining "I felt that I could bottle it in . . . I could contain it and move on with my life."  She only told a person she volunteered with at the hospital.  More than a year later, in a college application essay, A.M. mentioned being sexually assaulted by an uncle—"my mind subconsciously just wrote about the incident in the essay."  The college reported

the allegations to the department of health and human services and then law enforcement became involved. An investigation commenced, resulting in the charges and trial here.

A doctor and a forensic interviewer from the Child Protection Center testified. The doctor evaluated the child after the report, so almost two years after the alleged abuse. The doctor did not find evidence of healed injuries or scars during A.M.'s exam and could not determine physically whether sexual abuse did or did not occur. The doctor explained that the lack of injuries did not exclude sexual contact as reported by A.M. The forensic interviewer explained sometimes children will disclose additional instances of abuse after the interview once they feel supported by people they trust. The State then called a doctor specializing as a urologist to explain circumcision. He testified that when erect, it is "difficult to tell" if a penis is circumcised or not—"they look largely the same."

Two days after A.M. testified, and the day after the court denied his motion for judgment of acquittal, Pettit moved for a mistrial. The basis was A.M.'s testimony about an alleged daytime incident of abuse in the bedroom which had not been charged or mentioned in the minutes of testimony. Pettit's counsel argued that without notice to prepare a defense for the specific incident, the additional testimony was "inflammatory" and "highly prejudicial to him and his rights." The State resisted, urging it did not know about the testimony ahead of time, the evidence was admissible, the issue could be handled with jury instructions, and the evidence was more probative than prejudicial. In ruling on the motion, the court noted the evidence was already in without objection, but how the jury used it could be limited with the jury instructions. The court observed the

incident could not be used as the basis under counts one through four, and that the court understood Pettit had already been planning to testify in his own defense. The court denied the motion.

Pettit's son testified for the defense. He described the layout of the bedroom he shared with his father in 2019, and when asked about floor space answered there was "[n]ot very much room." The son testified he would hear when Pettit came home and into the room, describing himself as "a light sleeper" who could "easily be awaken[ed]." He said his father left to drive to work around 1:00 p.m. and arrived home around 2:00 or 3:00 a.m., commuting with a group of people.

Pettit testified in his own defense. He testified his working hours were 4:00 p.m. to 1:45 a.m., but he usually left at 1:00 p.m. and would not get home until 3:00 a.m. He denied ever being alone with A.M. or having any form of sexual contact with her. He also stated he was not circumcised and does not appear circumcised even when erect. He maintained he does not drink alcohol. Pettit said he had told A.M.'s stepfather she was going out and leaving the children alone at night, creating friction, and A.M. said she would "send me to prison for that." In his testimony, he also testified the vans he owned in 2019 were dark gray and burgundy, not white.

Rebuttal testimony by the stepfather related the van used for their work commute in 2019 was white. He testified he often drove home from work and would drop off Pettit at home before dropping off the other commuters, which usually took twenty to thirty minutes. He also denied Pettit had ever told him A.M. was sneaking out at night.

One count charging general performance of sex acts was dismissed at the State's request before the case went to the jury. The case was submitted to the jury with instructions for the four remaining counts each providing a specific sex act that was alleged to have occurred.[2] The jury found Pettit guilty of all four counts.

Pettit appeals. He asserts the district court should have granted his motion for judgment of acquittal on all four counts, challenging the sufficiency of the evidence. He also argues the court should have granted his motion for mistrial based on A.M.'s testimony of an uncharged allegation of sexual assault.

## II. Standard of Review

"A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law." *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010).

> In making determinations regarding the sufficiency of the evidence, we "view the evidence in the light most favorable to the state, regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence." . . . . "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a

---

[2] The sex acts specified in the four instructions were:
1. "Between and including June 1, 2019 and September 30, 2019 . . . the Defendant performed a sex act with A.M. by inserting his penis into her vagina in the bedroom at night."
2. "Between and including June 1, 2019 and September 30, 2019 . . . the Defendant performed a sex act with A.M., by inserting his penis into her mouth."
3. "Between and including June 1, 2019 and September 30, 2019 . . . the Defendant performed a sex act with A.M. by touching her vagina with his hand."
4. "Between and including June 1, 2019 and September 30, 2019 . . . the Defendant performed a sex act with A.M. by inserting his penis into her vagina while in the van."

reasonable doubt." Evidence can be either circumstantial or direct, or both.

*State v. Lilly*, 930 N.W.2d 293, 298 (Iowa 2019) (internal citations omitted).

We review a "challenge to the district court's denial of a mistrial for an abuse of discretion." *State v. Brown*, 996 N.W.2d 691, 696 (Iowa 2023). "The defendant is only entitled to a new trial if the prejudice resulting from the denial prevented the defendant from having a fair trial." *Id.*

**III. Analysis**

**A. Sufficiency of the evidence.** The jury found sufficient evidence to convict Pettit of (1) inserting his penis in A.M.'s vagina in the bedroom at night; (2) inserting his penis into A.M.'s mouth; (3) touching her vagina with his hand; and (4) inserting his penis into her vagina in the van.

Pettit contends A.M.'s testimony was insufficient to support his conviction without corroboration or forensic evidence. He challenges points of A.M.'s testimony alleging he drank alcohol and whether he was circumcised, and urges as more credible his own testimony denying all encounters and his son's testimony he would have woken up during the first allegation and the room did not have sufficient room for what happened.

"[I]t is the jury's function to determine the credibility of a witness." *Brown*, 996 N.W.2d at 696. "[W]e defer to the fact finder's determinations concerning witness credibility" and "are bound by the jury's verdict unless it is not supported by substantial evidence." *State v. Wells*, 629 N.W.2d 346, 356 (Iowa 2001). We recognize that, "[a] sexual abuse victim's testimony alone may be sufficient evidence for conviction." *State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021);

*see* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."). A defendant's assertion the victim's "testimony is not credible enough to convince a rational fact finder of his guilt beyond a reasonable doubt is unavailing for sufficiency of the evidence purposes." *Donahue*, 957 N.W.2d at 11.

A.M.'s testimony, which we walked through in detail above, provided substantial evidence from which a rational fact finder could conclude the sexual assaults occurred. She testified about five separate incidents of sex acts performed on her by Pettit, including what she had been doing before, what she wore, details of the physical environment, the circumstances of Pettit initiating the sexual incident, how it felt, tasted, or smelled, and what she did after. The jury had the opportunity to hear A.M.'s claims, Pettit's denials, and the supporting witnesses providing related factual information. The jury then weighed the testimony and the credibility of each witness. The jury exercised its function of determining the witnesses' credibility and decided A.M.'s was the more credible version of events. *See Brown*, 996 N.W.2d at 696. We defer to that finding. We conclude the evidence was sufficient to convince a reasonable jury of Pettit's guilt beyond a reasonable doubt and affirm the jury's verdict. *See Wells*, 629 N.W.2d at 356.

**B. Mistrial motion.** Two days after A.M. testified about "a previously undisclosed sexual encounter," Pettit moved for a mistrial.[3] He claimed the unfair prejudice from this testimony substantially outweighed its probative value, which misled and confused the jury. More specifically, Pettit claims he was denied a fair

---

[3] The transcript indicates the day before, the parties had an off-the-record discussion about the additional testimony. Pettit's counsel indicated a motion in limine would have been filed regarding the uncharged assault.

trial because the evidence would have been excluded under Iowa Code section 701.11 and Iowa Rule of Evidence 5.404(b). He concludes, "It is self-evident that a new undisclosed sexual abuse allegation amounted to a mistrial."

The State responds Pettit did not object to the testimony or move for mistrial at the time, so error is not preserved. In the event we find error was preserved, the State urges the testimony did not compromise Pettit's right to a fair trial because it simply constituted evidence of Pettit's abuse of A.M. admissible under Iowa Code section 701.11. *See State v. Reyes*, 744 N.W.2d 95, 102–03 (Iowa 2008) (admitting evidence of prior sexual abuse with the same alleged perpetrator and alleged victim when "offered in a direct, concise, and noninflammatory fashion").

Without deciding whether the issue is preserved, we conclude the court did not abuse its discretion in denying the request for mistrial because the evidence was admissible under section 701.11 and rule 5.404(b). When considering the evidence's admissibility if the issue had been raised when the testimony was given, the district court expressly noted "I would have found that it was more probative."

Section 701.11(1) provides:

> In a criminal prosecution in which a defendant has been charged with sexual abuse, evidence of the defendant's commission of another sexual abuse is admissible and may be considered for its bearing on any matter for which the evidence is relevant. This evidence, though relevant, may be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. This evidence is not admissible unless the state presents clear proof of the commission of the prior act of sexual abuse.

The statute includes a ten-day notice requirement "[i]f the prosecution intends to offer evidence pursuant to this section" but the court may permit less time "for good cause shown."  Iowa Code § 701.11(2).  The district court found good cause for not giving notice because the State did not know about this incident before A.M. testified.

When it comes to the probative-versus-prejudicial-nature balancing, section 701.11 "vests discretion in trial courts."  *State v. Reyes*, 744 N.W.2d 95, 103 (Iowa 2008).  "[T]he potential of undue prejudice where prior sexual abuse evidence is admitted in cases involving the same alleged perpetrator and victim is far less than in cases where the prior bad acts involve other alleged victims."  *Id.* at 102.  And evidence of other sexual abuse involving the same victim "demonstrate[s] the nature of the defendant's relationship and feelings toward a *specific* individual" instead of demonstrating a general propensity.  *Id.* at 103.  The court in *Reyes* held, "the admission of the evidence of prior acts of sexual abuse involving the same alleged perpetrator and the alleged victim is therefore consistent with Iowa Code section 701.11."  *Id.*

Pettit does not explain how the additional incident related during A.M.'s testimony—which was consistent with the other incidents described—amounted to unfair prejudice; he merely suggests jury confusion and a "self-evident" need for mistrial.  The jury instructions were detailed about which incidents Pettit was on trial for and included an instruction limiting the jury's consideration of the additional incident to motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.  This instruction was consistent with rule 5.404(b) and mitigated any unfair prejudice to Pettit.  *See State v. Plain*, 898

N.W.2d 801, 815 (Iowa 2017) ("Generally, a district court's decision not to grant a mistrial but to offer a cautionary instruction instead is entitled to broad deference. Cautionary instructions are sufficient to mitigate the prejudicial impact of inadmissible evidence 'in all but the most extreme cases.'" (citations omitted)). "We presume jurors follow the court's limiting instructions." *State v. Gomez Garcia*, 904 N.W.2d 172, 183 (Iowa 2017). So, we are satisfied the jury would not have based conviction of any charges on the previously-undisclosed incident. As in *Reyes*, the evidence was given in a "direct, concise, and noninflammatory fashion" and was similar to the underlying charge. *See id.* The testimony was admissible under section 701.11 and did not require exclusion based on unfair prejudice.

We conclude Pettit did not establish A.M.'s testimony to an additional sexual abuse incident caused undue prejudice. Therefore, he has not shown the district court's denial of his motion for mistrial was an abuse of discretion that deprived him of a fair trial. *See Brown*, 996 N.W.2d at 696. We affirm the court's ruling.

**AFFIRMED.**